IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION

| | |
|---|---|
| EQT PRODUCTION COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>AUSTIN CAPERTON, in his official capacity as Secretary of the West Virginia Department of Environmental Protection,<br><br>Defendant. | ELECTRONICALLY FILED<br>Apr 12, 2018<br>U.S. DISTRICT COURT<br>Northern District of WV<br><br>Civil Action No. 1:18-cv-72 (Keeley)<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff EQT Production Company (EQT), by and through its undersigned counsel, brings this Complaint against Defendant Austin Caperton, in his official capacity as the Secretary of the West Virginia Department of Environmental Protection, and alleges as follows:

### NATURE OF THE ACTION

1. EQT brings this action pursuant to the Contract Clause, Art. I, § 10, cl. 1, and the Due Process Clause, Amend. XIV, § 1, of the United States Constitution; the Civil Rights Act, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, to obtain a declaration of the unconstitutionality of West Virginia's Flat-Rate Statute, W. Va. Code § 22-6-8, which fundamentally alters and impairs the terms of private flat-rate oil and gas leases that were executed before its enactment.

2. EQT currently leases from West Virginia mineral owners the right to drill on identified parcels of land for oil and natural gas. Some of those leases—approximately 1,700—are

"flat-rate" leases that were executed long before West Virginia enacted the Flat-Rate Statute. Under the terms of those leases, EQT is entitled to extract natural gas in exchange for a flat, annual royalty for each producing well that EQT operates on the leasehold premises.

3. The Flat-Rate Statute infringes on EQT's vested drilling rights under its flat-rate leases. Unless EQT accedes to the compensation scheme devised by the Legislature for payment to lessors—which supplants EQT's privately negotiated flat-rate payments with a volume-based payment formula—the Flat-Rate Statute bars EQT from receiving permits to drill or rework any well on such a lease. The Flat-Rate Statute's volume-based payment formula is calculated at a rate and by a method that have no connection to any identified public purpose.

4. The Flat-Rate Statute thus substantially impairs EQT's vested drilling rights under its flat-rate leases and imposes unconstitutional conditions on EQT's exercise of its property rights under those contracts. Accordingly, EQT seeks declarations that the Flat-Rate Statute—by prohibiting the issuance of drilling permits for wells subject to flat-rate leases, by imposing extraction-based royalties on such leases, and by mandating a calculation method for those royalties that has no rational connection to the purported purpose of the statute—violates the Contract Clause, Art. I, § 10, cl. 1, and the Due Process Clause, Amend. XIV, § 1, of the United States Constitution.

**PARTIES**

5. Plaintiff EQT is a Pennsylvania corporation with its principal place of business located at 625 Liberty Avenue, Suite 1700, Pittsburgh, PA 15222. EQT is licensed to do business in West Virginia and has played a major role in oil and gas extraction from the Appalachian Basin for nearly 130 years. EQT operates over 13,600 productive natural gas wells in the Appalachian Basin, encompassing some 97 trillion cubic feet equivalent of total resource potential. EQT operates more than 5,000 wells in West Virginia, roughly 1,700 of which are subject to flat-rate leases

that predate the enactment of the Flat-Rate Statute. Flat-rate leases represent a relatively small percentage of all oil and gas leases in West Virginia. Among oil and gas producers in West Virginia, however, EQT believes that it holds the largest number of unmodified flat-rate leases.

6. Defendant Austin Caperton is the Secretary of the West Virginia Department of Environmental Protection. As Secretary, Caperton is charged with enforcement of the Flat-Rate Statute, and exercises that function under color of state law. W. Va. Code §§ 22-6-1(f), 22-6-8(h).

## JURISDICTION AND VENUE

7. EQT's claims arise under the United States Constitution; the Civil Rights Act, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* This Court therefore has federal question jurisdiction under 28 U.S.C. § 1331. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (a)(4), because EQT brings this claim under the federal civil rights statutes and seeks redress for the deprivation, under color of state law, of rights secured by the United States Constitution.

8. Venue is proper in this Court because EQT holds many flat-rate leases in the counties that comprise the Clarksburg Division of the Northern District of West Virginia, and the Flat-Rate Statute is subject to statewide enforcement. 28 U.S.C. § 1391(b)(2).

## FACTS

### A. EQT Enters Flat-Rate Leases and Invests for Over a Century in West Virginia Mineral Extraction

9. Beginning more than a century ago and continuing through the mid-1900s, EQT and its predecessors in title (for simplicity, EQT) entered into certain leases with holders of the mineral interests in land in West Virginia that provide EQT the right to extract the natural gas beneath such land in exchange for flat annual fees.

10. Under such a lease, EQT pays the lessor a flat royalty each year for each producing gas well it operates on the land subject to the lease, regardless of how much natural gas EQT is able to extract from such well. Many of the leases are perpetual leases, meaning that EQT retains the right to extract oil and natural gas—and continues to pay the lessor—as long "as oil or gas is produced." *See* Ex. A (sample lease). Most of EQT's flat-rate leases provide for a $100 to $300 annual payment to the lessor for each producing gas well, in addition to enough gas, free of charge, for the lessor to use in the lessor's primary dwellings on the property. Most of the leases also provide for an additional in-kind royalty, applicable where the well produces petroleum oil, consisting of one-eighth of the oil produced.

11. During the time period that many of the leases were executed, natural gas extraction—particularly as compared to oil extraction—was a growing, developing technology that required significant investment to overcome various technological and infrastructure limitations. It was entirely foreseeable that, over time and with investment, mineral extraction technology and related infrastructure would continue to improve, new technologies would develop, and the market for natural gas would grow. While EQT and the counterparty lessors could not have known what specific extraction techniques would be developed, how fast improvements would come, or how much they would cost, they necessarily understood that the technology would continue to develop and improve.

12. The leases reflect the contracting parties' agreement that, while royalties on petroleum oil extraction would be volume-based (*i.e.*, an in-kind royalty of one-eighth of the oil produced), the royalty for natural gas extraction would be set at a specific annual price for the life of the lease (*i.e.*, as long as the wells continued to produce). The flat royalty thus apportioned risk and benefits related to a developing technology according to each party's preferences at the time:

lessors would receive a reliable payment for natural gas rights for each well (regardless of how fruitful technological development proved to be), in addition to the right to as much gas as they needed for their personal, domestic use (regardless of whether the well was profitable for EQT after the lessor took its share). Moreover, the lessors would have no part in paying the costs of extraction or in investing in the research and development, engineering, and infrastructure needed to improve extraction and production technologies. On the other hand, EQT would be obligated to pay a flat amount per gas-producing well regardless how much (or how little) gas was extracted, and regardless of whether market conditions and costs enabled EQT to earn a profit. This structure gave EQT the incentive to invest in improving natural gas extraction, production, and marketing.

13. Making such investments is exactly what EQT has done. Over the better part of a century, EQT has invested millions of dollars to improve techniques for extracting natural gas and for infrastructure to develop an integrated market for natural gas. During that time, EQT was bound to pay, and did pay, the flat-rate royalty to the lessors, regardless of the success of its investments. Unsurprisingly, as a direct result of EQT's long-term investments—in which the lessors had no participation and for which they bore no risk—most wells now produce more natural gas than they did when the flat-rate leases were executed.

    **B. After Decades of Investment by EQT in Natural Gas Production, the West Virginia Legislature Redistributes the Benefits of the Leases**

14. As natural gas production gradually increased over the years as a result of EQT's substantial investment, West Virginia lessors who had entered into flat-rate leases became dissatisfied with the bargains they had struck—under which they had been paid for decades. Rather than negotiate amendments to their leases, those lessors prevailed on the West Virginia Legislature to modify the parties' rights under those leases.

15. In 1982, the West Virginia Legislature enacted the Flat-Rate Statute. *See* W. Va. Code § 22-6-8. As reflected in the statute, the Legislature understood that the Contract Clause of the United States Constitution limits its authority to abrogate existing flat-rate leases, *see id.* § 22-6-8(a)(4), but it nevertheless sought "to prevent the extraction, production or marketing of oil or gas under a lease . . . providing a flat well royalty." *Id.* § 22-6-8(b). In an attempt to circumvent the Contract Clause, the Legislature crafted a law with two components. First, the statute "prohibit[s] the issuance of any permit required by [the State] for the development of oil or gas" for wells subject to a flat-rate lease. *Id.* Second, it provides a mechanism for a flat-rate lessee, such as EQT, to "avoid the permit prohibition" if it promises to "tender to the [lessor] not less than [a] one eighth" royalty on the natural gas and oil produced. *Id.* § 22-6-8(e). In other words, the Legislature barred EQT from receiving permits needed to exercise its contract rights under the leases, then conditioned a waiver of that prohibition on EQT's payment to the lessors of significantly more compensation than what was agreed in the leases.

16. The current Flat-Rate Statute, as enacted in 1982 and remaining in effect in relevant part through May 2018, requires EQT, in order to obtain necessary permits, to pay lessors a one-eighth royalty on the sale price of the natural gas "at the wellhead"—that is, at the moment it is extracted from the ground. *Id.* at § 22-6-8(e); *see also Leggett* v. *EQT Production Co.*, 800 S.E.2d 850 (W. Va. 2017). The "at the wellhead" price is calculated as the interstate pipeline index price (roughly the price ultimately received in the downstream sale of gas) less the post-production expenses EQT incurs to gather, compress, transport, and market the gas.

17. Recently, the Legislature amended the Flat-Rate Statute to effect an additional redistribution of the benefits of the leases. Senate Bill 360 (SB 360), which becomes effective May 31, 2018, requires EQT to pay the royalty on the ultimate sale price by EQT to an unaffiliated third

6

party. *See* W. Va. Code § 22-6-8(e) (2018 ed. forthcoming).[1] That price is substantially higher than the at-the-wellhead price, because it reflects the significant expenses that EQT or its affiliate incurs after extraction, including the cost of gathering, compressing, processing, and transporting the gas. And because SB 360 forbids EQT from deducting any of the post-production expenses from the downstream index price used to calculate the royalty, it awards the lessors a greater share of EQT's revenues than under the current regime.

18.  The Legislature has thus twice substantially impaired EQT's contract rights by retroactively awarding the lessors more compensation than they bargained for in the leases, based on some ill-defined notion of "fairness" in the distribution of the "natural wealth of th[e] state" as between private parties: originally by enacting the Flat-Rate Statute, and more recently by gifting the lessors an even greater share of the fruits of EQT's decades of investment. Notably, the Legislature has singled out flat-rate leases by purporting to regulate the fairness of the amount paid to lessors in imposing a compensation formula and rate on these privately negotiated contracts. For all other types of leases, the West Virginia Department of Environmental Protection plays no role in regulating rates or other terms of the leases, let alone in dictating rates deemed by legislative fiat to be fair. Moreover, the Flat-Rate Statute severely disrupts the contractual expectations of EQT, which has invested significantly in improving the extraction of natural gas, premised on its ability to enjoy the returns of such investments.

19.  Since the enactment of the Flat-Rate Statute in 1982, EQT has applied for hundreds of permits to drill new wells or rework its existing wells on land subject to flat-rate leases. In order to secure those permits, EQT has been compelled to execute affidavits committing to tender to the

---

[1] The text of the enrolled bill is available at http://www.wvlegislature.gov/Bill_Text_HTML/2018_SESSIONS/RS/bills/SB360%20SUB1%20ENR.pdf.

lessor a one-eighth royalty on EQT's proceeds at the wellhead of its natural gas extraction from the well, as required by the Flat-Rate Statute now in effect. The prohibition on the issuance of permits for extraction subject to flat-rate leases has substantially impaired such leases by frustrating EQT's ability to exercise its contractual rights under those leases, unless it agrees to pay greater consideration for those rights than what the contracts themselves specify.

20. EQT must continue to apply for permits from the West Virginia Department of Environmental Protection, overseen by defendant Secretary Caperton, to drill new wells or rework existing wells to extract minerals from land subject to its flat-rate leases. In order to secure such permits after SB 360 takes effect on May 31, 2018, EQT will be compelled to execute affidavits that submit to even more financially onerous and redistributive requirements: namely, that EQT shall tender to the lessor a one-eighth royalty of the gross proceeds of its natural gas extraction, free from any deductions for post-production expenses, received at the first point of sale to an unaffiliated third-party purchaser in an arm's length transaction. Without justification, the SB 360 formula requires EQT to pay royalties on a price that is often higher than EQT actually receives for the gas, and to pay royalties on refined natural gas products created and sold after EQT sells the raw gas. Moreover, because rates and calculation methods used in other types of oil and gas leases are not regulated by a legislative regime designed to ensure "fairness" in the distribution of the benefits under the lease, the statute singles out flat-rate lessees. SB 360's requirements will cause further substantial impairment of EQT's contractual rights under the flat-rate leases, by requiring EQT to pay even greater consideration for its rights than what the contracts themselves specify.

21. EQT's business development and expansion in the State are inhibited when it cannot rely on the terms of the many contracts it has executed with West Virginian lessors. For 2018

alone, despite similar acreage holdings in both States, EQT has only 28 wells planned for West Virginia, as compared to 122 in Pennsylvania.  West Virginia's attempts to alter economics of EQT's flat rate leases have increased costs and forced EQT to look elsewhere for development opportunities.

22.     These incursions on EQT's contractual rights—West Virginia's only regulation of private oil and gas lease royalties—are without any constitutionally cognizable justification.  The Flat-Rate Statute, both in its currently operative form and as amended by SB 360, lacks the significant and legitimate public purpose that is required to warrant the substantial impairment of EQT's contract rights that it imposes.  Far from benefiting West Virginians generally or solving a broad and general social or economic problem, the Flat-Rate Statute creates a windfall for a special interest:  a small but vocal faction of private lessors.

**COUNT ONE – DECLARATORY RELIEF –
VIOLATION OF THE CONTRACT CLAUSE**
**(Permit-Prohibition Provision)**

23.     The allegations in the preceding paragraphs are incorporated and adopted as if fully set forth herein.

24.     Under the Civil Rights Act, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, this Court has the power to declare the rights and legal relations of EQT and the Secretary with respect to EQT's flat-rate leases and West Virginia's prohibition against the issuance of drilling permits for wells subject to those flat-rate leases.

25.     The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Under the Contract Clause, any state law that operates as a substantial impairment of existing contractual rights or obligations is unconstitutional unless the State can show that the impairment

serves a significant and legitimate public purpose and that the adjustment of contractual rights and responsibilities is reasonable and appropriate to serve that purpose.

26. EQT's existing flat-rate leases are valid contracts because they are products of offers, acceptances, mutual assent, and the exchange of valid consideration in the form of, *inter alia*, each party's contractual obligations. Those leases were entered into and became valid before West Virginia enacted the Flat-Rate Statute in 1982.

27. Pursuant to the terms of those contracts, EQT is obligated to pay lessors a specified, flat amount each year in exchange for the right to produce natural gas. The extraction of petroleum oil and natural gas is the purpose and object of those leases.

28. The Flat-Rate Statute as enforced by the Secretary, acting under the color of state law, both in its currently operative and recently amended form, thwarts EQT's exercise of its vested contractual rights unless EQT accedes to make payments other than those that the parties freely negotiated. Specifically, the Flat-Rate Statute prohibits the issuance of permits in West Virginia for new wells or reworked wells subject to flat-rate leases, *i.e.*, leases "in which the royalty is based solely on the existence of a producing well, and thus is not inherently related to the volume of the oil or gas produced or marketed." W. Va. Code § 22-6-8(a)(1). The Flat-Rate Statute's permit-prohibition provision thereby impairs EQT's contractual rights under the leases by frustrating the purpose and object of the contract.

29. The substantial impairments created by the Flat-Rate Statute's permit-prohibition provision are not justified by a significant and legitimate public purpose.

30. The substantial impairments created by the Flat-Rate Statute permit-prohibition provision are not reasonable or appropriate adjustments of the contracting parties' rights and responsibilities.

31. Accordingly, the permit-prohibition provision of the Flat-Rate Statute violates the Contract Clause of the United States Constitution, and EQT is entitled to a declaration that the Flat-Rate Statute's permit-prohibition provision is unconstitutional as enforced by the Secretary, acting under color of law, against EQT's existing flat-rate leases.

32. EQT is also entitled to recover its costs, including attorneys' fees, pursuant to 42 U.S.C. § 1988(b), against the Secretary.

### COUNT TWO – DECLARATORY RELIEF – VIOLATION OF THE CONTRACT CLAUSE AND IMPOSITION OF UNCONSTITUTIONAL CONDITIONS
(At-the-Wellhead Royalty Provision)

33. The allegations in the preceding paragraphs are incorporated and adopted as if fully set forth herein.

34. Under the Civil Rights Act, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, this Court has the power to declare the rights and legal relations of EQT and the Secretary with respect to EQT's flat-rate leases, West Virginia's prohibition against the issuance of drilling permits for wells subject to those flat-rate leases, and the Flat-Rate Statute's conditioning of the receipt of permits on EQT's payment to lessors of a variable-rate royalty not required by the flat-rate leases.

35. The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Under the Contract Clause, any state law that operates as a substantial impairment of existing contractual rights or obligations is unconstitutional unless the State can show that the impairment serves a significant and legitimate public purpose and that the adjustment of contractual rights and responsibilities is reasonable and appropriate to serve that purpose.

36. Under the unconstitutional-conditions doctrine, a State cannot condition receipt of a government benefit based on the waiver of a constitutionally protected right. Similarly, denial of a public benefit may not be used by the government to create an incentive enabling the government to achieve what it may not command directly.

37. EQT's flat-rate leases grant EQT the right to extract natural gas on lessors' land in exchange for a flat-rate royalty, without payment of an extraction-based royalty. Those leases were in effect before the passage of the Flat-Rate Statute.

38. The Flat-Rate Statute's permit prohibition provision substantially impairs EQT's contractual rights and obligations by prohibiting EQT's receipt of drilling permits necessary for the exercise of its contractual rights under its preexisting flat-rate leases.

39. The Flat-Rate Statute's at-the-wellhead royalty provision, which was enacted in 1982 and is in effect until May 31, 2018, further violates the Contract Clause and the Due Process Clause of the Fourteenth Amendment by placing unconstitutional conditions on EQT's receipt of permits for wells subject to preexisting flat-rate leases—specifically, by forbidding the issuance of the permits unless EQT forgoes its constitutionally protected contract and property rights by granting lessors an extraction-based royalty based on the proceeds received from the production of natural gas, calculated at the price at the wellhead. Those unconstitutional conditions, as enforced by the Secretary under color of state law, offer to rectify one impairment of EQT's constitutional rights—the denial of required permits—in exchange for EQT accepting a different deprivation of contract and property rights, in the form of the at-the-wellhead variable-rate royalty.

40. From 1982 until May 31, 2018, EQT has been and is forced to execute affidavits promising to tender the at-the-wellhead variable-rate royalty to lessors in exchange for permits.

EQT is currently operating many wells subject to permits for which EQT was forced to sign an affidavit, and will continue to operate these wells in the future.

41. West Virginia is constitutionally barred from requiring EQT to give up its constitutional rights against unjustified interference in its preexisting contracts, and its property rights in those contracts, in exchange for a discretionary benefit conferred by the State.

42. Shifting the benefits of private contracts between private parties, as West Virginia has done in this case, is not in any way related to any conceivable state interest in effecting the permitting regime.  Moreover, regulating the fairness of payment terms in a singled-out class of leases executed between private parties, and dictating the terms of those leases, serves no significant or legitimate public purpose.  Instead, the Flat-Rate Statute coerces EQT to act in a way that the State could not otherwise constitutionally compel.

43. Accordingly, the at-the-wellhead royalty provision of the Flat-Rate Statute violates the Contract Clause of the United States Constitution and the Due Process Clause of the Fourteenth Amendment by imposing unconstitutional conditions on the exercise of EQT's rights under those provisions.  EQT is entitled to a declaration that the currently operative Flat-Rate Statute is unconstitutional as enforced by the Secretary, acting under color of law, against EQT's existing flat-rate leases.

44. EQT is also entitled to recover its costs, including attorneys' fees, pursuant to 42 U.S.C. § 1988(b), against the Secretary.

### COUNT THREE – DECLARATORY RELIEF – VIOLATION OF THE CONTRACT CLAUSE AND IMPOSITION OF UNCONSTITUTIONAL CONDITIONS
(Unaffiliated-Sale-Without-Deduction Royalty Provision)

45. The allegations in the preceding paragraphs are incorporated and adopted as if fully set forth herein.

46. Under the Civil Rights Act, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, this Court has the power to declare the rights and legal relations of EQT and the Secretary with respect to EQT's flat-rate leases, West Virginia's prohibition against the issuance of drilling permits for wells subject to those flat-rate leases, and the Flat-Rate Statute's conditioning of the receipt of permits on EQT's payment to lessors of a variable-rate royalty not required by the flat-rate leases.

47. The Contract Clause of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Under the Contract Clause, any state law that operates as a substantial impairment of existing contractual rights or obligations is unconstitutional unless the State can show that the impairment serves a significant and legitimate public purpose and that the adjustment of contractual rights and responsibilities is reasonable and appropriate to serve that purpose.

48. Under the unconstitutional-conditions doctrine, a State cannot condition receipt of a government benefit based on the waiver of a constitutionally protected right. Similarly, denial of a public benefit may not be used by the government to create an incentive enabling the government to achieve what it may not command directly.

49. EQT's flat-rate leases grant EQT the right to extract natural gas on lessors' land in exchange for a flat-rate royalty, without payment of an extraction-based royalty. Those leases were in effect before the passage of the Flat-Rate Statute, and before the passage of SB 360.

50. The Flat-Rate Statute's permit-prohibition provision substantially impairs EQT's contractual rights and obligations by prohibiting EQT's receipt of drilling permits necessary for the exercise of its contractual rights under its preexisting flat-rate leases.

51. The Flat-Rate Statute's unaffiliated-sale-without-deduction royalty provision, set forth in SB 360 and to take effect on May 31, 2018, further violates the Contract Clause and the Due Process Clause of the Fourteenth Amendment by placing unconstitutional conditions on EQT's receipt of permits for wells subject to preexisting flat-rate leases—specifically, by forbidding the issuance of the permits unless EQT grants lessors an extraction-based royalty based on the proceeds received from the production of natural gas, at the first unaffiliated sale and without deduction of post-production expenses. These unconstitutional conditions, as enforced by the Secretary, acting under the color of state law, offer to rectify one impairment of EQT's constitutional rights—the denial of required permits—in exchange for EQT accepting a different deprivation of contract and property rights, in the form of the SB 360 variable-rate royalty.

52. Effective May 31, 2018, EQT will be forced to execute affidavits promising to tender the variable-rate royalty articulated in SB 360 to lessors in exchange for permits. Those unconstitutionally obtained affidavits will be in effect so long as the associated permits are active as to the wells in question. EQT plans to apply for drilling permits from the West Virginia government in the future, and would likely apply for a greater number in the absence of the Flat-Rate Statute and SB 360.

53. West Virginia is constitutionally barred from requiring EQT to give up its constitutional rights against unjustified interference in its preexisting contracts, and its property rights in those contracts, in exchange for a discretionary benefit conferred by the State.

54. Shifting the benefits of private contracts between private parties, as West Virginia has done in this case, is not in any way related to any conceivable state interest in effecting the permitting regime. Moreover, regulating the fairness of payment terms in a singled-out class of

leases executed between private parties, and dictating the terms of those leases, serves no significant or legitimate public purpose. Indeed, SB 360's requirements serve no legitimate purpose whatsoever. It does not further the State's professed goal of commanding variable royalties; it merely alters the Flat-Rate Statute's original royalty calculation to further benefit lessors. The unaffiliated-sale-without-deduction royalty provision increases the Flat-Rate Statute's redistribution of private contract benefits, with no proffered public need for such increase nor any rationale for the method of increasing the benefit to the lessors. In fact, SB 360's provisions puts flat-rate lessors in a preferred position compared to all other mineral lessors in West Virginia: most lessors (*e.g.*, those holding variable royalty leases) are paid based on the price received at the affiliate sale. With SB 360, the State has awarded windfall benefits to a vocal faction of lessors, at EQT's expense.

55.     The Flat-Rate Statute coerces EQT to act in a way that the State could not otherwise constitutionally compel.

56.     Accordingly, SB 360's unaffiliated-sale-without-deduction royalty provision violates the Contract Clause of the United States Constitution and the Due Process Clause of the Fourteenth Amendment by imposing unconstitutional conditions on the exercise of EQT's rights under those provisions. EQT is entitled to a declaration that the Flat-Rate Statute, as amended by SB 360, is unconstitutional as enforced by the Secretary, acting under color of law, against EQT's existing flat-rate leases.

57.     EQT is also entitled to recover its costs, including attorneys' fees, pursuant to 42 U.S.C. § 1988(b), against the Secretary.

## **PRAYER FOR RELIEF**

**WHEREFORE**, EQT respectfully requests:

(1) The entry of an Order declaring that the Flat-Rate Statute's permit-prohibition provision, as applied to preexisting flat-rate leases, violates the Contract Clause of the United States Constitution;

(2) The entry of an Order declaring that the Flat-Rate Statute's at-the-wellhead royalty provision, which is in force until May 31, 2018, violates the Contract Clause and the Due Process Clause of the Fourteenth Amendment as applied to preexisting flat-rate leases;

(3) The entry of an Order declaring that SB 360's unaffiliated-sale-without-deduction royalty provision, as applied to preexisting flat-rate leases, violates the Contract Clause and the Due Process Clause of the Fourteenth Amendment;

(4) Any and all special damages to which EQT may be entitled;

(5) Pre-judgment and post-judgment interest;

(6) Attorneys' fees; and

(7) Such other and further relief as the Court may deem proper.

## **JURY TRIAL DEMANDED**

<table>
<tr><td>

OF COUNSEL:

WILLIAMS & CONNOLLY LLP

Kannon K. Shanmugam
Katherine M. Turner
Eden Schiffmann
Matthew J. Greer
(applications for *pro hac vice* forthcoming)
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
kshanmugam@wc.com
kturner@wc.com
eschiffmann@wc.com
mgreer@wc.com

Dated:  April 12, 2018

</td><td>

BABST CALLAND CLEMENTS and ZOMNIR, P.C.

By: */s/* Timothy M. Miller
    Timothy M. Miller (W. Va. Bar No. 2564)
    Katrina N. Bowers (W. Va. Bar No. 12337)
    BB&T Square
    300 Summers Street, Suite 1000
    Charleston, WV 25301
    (681) 205-8888
    tmiller@babstcalland.com
    kbowers@babstcalland.com

*Attorneys for Plaintiff EQT Production Company*

</td></tr>
</table>