# EXHIBIT A

Notice: On January 25, 2017 the Court granted a petition for rehearing in this matter.
This opinion is therefore withdrawn and no longer effective.

IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2016 Term

_____

No. 16-0136

_____

**FILED**

**November 17, 2016**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

PATRICK D. LEGGETT; KATHERINE F. LEGGETT;
GEORGE D. MCKAIN, by his attorney in fact,
ANITA KATHRYN MCKAIN GREER;
and ADELE S. MCDOUGAL,
Plaintiffs Below, Petitioners

v.

EQT PRODUCTION COMPANY, a Pennsylvania corporation;
EQT CORPORATION, a Pennsylvania corporation; EQT ENERGY, LLC, a Delaware
limited liability company; EQT INVESTMENTS HOLDINGS, LLC, a Delaware limited
liability company; EQT GATHERING, LLC, a Delaware limited liability company; and
EQT MIDSTREAM PARTNERS, LP, a Delaware limited partnership,
Defendants Below, Respondents

_____

Certified Questions from the United States District Court
for the Northern District of West Virginia

FIRST CERTIFIED QUESTION ANSWERED

_____

Submitted: September 14, 2016
Filed: November 17, 2016

Marvin W. Masters, Esq.                    David K. Hendrickson, Esq.
Richard A. Monahan, Esq.                   Carl L. Fletcher, Jr., Esq.

April D. Ferrebee, Esq.
The Masters Law Firm LC
Charleston, West Virginia

Hendrickson & Long PLLC
Charleston, West Virginia
Counsel for Respondents

Michael W. Carey, Esq.
Carey, Scott, Douglas & Kessler, PLLC
Charleston, West Virginia
Counsel for Petitioners

Timothy M. Miller, Esq.
Mychal S. Schulz, Esq.
Babst, Calland, Clements & Zomnir, P.C.
Charleston, West Virginia
Counsel for Amicus Curiae West Virginia
Oil and Natural Gas Association

Howard M. Persinger III, Esq.
Persinger & Persinger, L.C.
Charleston, West Virginia
Counsel for Amici Curiae West Virginia
Land & Mineral Owners' Association and
West Virginia Royalty Owners' Association

JUSTICE BENJAMIN delivered the Opinion of the Court.

CHIEF JUSTICE KETCHUM dissents and reserves the right to file a dissenting Opinion.

JUSTICE LOUGHRY dissents and reserves the right to file a dissenting Opinion.

SYLLABUS BY THE COURT

1.      "A de novo standard is applied by this court in addressing the legal issues presented by a certified question from a federal district or appellate court."  Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998).


2.      Whenever West Virginia Code § 22-6-8(e) (1994) requires the filing of an affidavit as a prerequisite to obtaining an oil or gas drilling or reworking permit, the averment in the affidavit that the landowner shall receive a royalty of not less than one-eighth of the amount realized by the holder of the working interest "at the wellhead" means that the royalty payment is not to be diluted by costs and losses incurred downstream from the wellhead before a marketable product is rendered.


3.      Whenever the lessee-owner of a working interest in an oil or gas well must comply with West Virginia Code § 22-6-8(e) by tendering to the lessor-owner of the oil or gas in place a royalty not less than one-eighth of the total amount paid to or received by or allowed to the lessee, the statute requires in addition that the lessee not deduct from that amount any expenses that have been incurred in gathering, transporting, or treating the oil or gas after it has been initially extracted, any sums attributable to a loss or beneficial use of volume beyond that initially measured, or any other costs that may be characterized as post-production.

Benjamin, Justice:

This proceeding arises upon our acceptance of certified questions from the United States District Court for the Northern District of West Virginia in connection with the underlying civil action filed by plaintiffs Patrick D. Leggett, Katherine F. Leggett, Anita Kathryn McKain Greer as attorney in fact on behalf of George D. McKain, and Adele S. McDougal.  The plaintiffs sued EQT Production Co. ("EQT") and five related entities,[1] alleging royalty underpayments with respect to the plaintiffs' ownership of oil and gas interests that EQT is contracted to exploit.  The district court granted summary judgment to the related entities and partial summary judgment to EQT, *see* Fed. R. Civ. P. 56(a), reserving its ruling on the remaining aspects of the plaintiffs' claims against EQT pending our disposition of the certified questions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The order of certification recites the undisputed material facts on which the district court relied, the salient portions of which follow.  Pursuant to a written agreement originally executed in Doddridge County in 1906, EQT is the successor lessee of certain mineral interests on the subject property, upon which nine oil and gas wells have been drilled.  The plaintiffs are among the successor lessors, whose undivided interests

---

[1] EQT's sister entities EQT Energy, LLC; EQT Investments Holdings, LLC; EQT Gathering, LLC; and EQT Midstream Partners, LP; together with their parent, EQT Corporation, were separately named as defendants.

collectively amount to seventy-five percent of the entirety of the oil and gas extracted by virtue of the 1906 lease. Of the total interest, the Leggetts own twelve and one-half percent, Mr. McKain owns twelve and one-half percent, and Ms. McDougal owns fifty percent.

With respect to a few wells that were in place before 1982, EQT pays a flat-rate royalty of three hundred dollars annually, in conformance with the terms of the original lease. The majority of the wells, however, are subject to the controlling "flat-rate statute" set forth in West Virginia Code § 22-6-8 (1994), initially enacted in 1982. On those wells, EQT pays a one-eighth royalty notwithstanding the lease. The statute provides in pertinent part:

> (a) The Legislature hereby finds and declares:
>
> (1) That a significant portion of the oil and gas underlying this state is subject to development pursuant to leases . . . wherein the owners of such oil and gas are paid upon a royalty or rental basis known in the industry as the annual flat well royalty basis, in which the royalty is based solely on the existence of a producing well, and thus is not inherently related to the volume of the oil and gas produced or marketed;
>
> (2) That continued exploitation of the natural resources of this state in exchange for such wholly inadequate compensation is unfair, oppressive, works an unjust hardship on the owners of the oil and gas in place, and unreasonably deprives the economy of the state of West Virginia of the just benefit of the natural wealth of this state;
>
> (3) That a great portion, if not all, of such leases . . . have been in existence for a great many years and were entered into at a time when the techniques by which oil and gas are

2

currently extracted, produced or marketed, were not known or
contemplated by the parties, nor was it contemplated by the
parties that oil and gas would be recovered or extracted or
produced or marketed from the depths and horizons currently
being developed by the well operators;

(4) That while being fully cognizant that the provisions of
section 10, article I of the United States Constitution and of
section 4, article II of the Constitution of West Virginia,
proscribe the enactment of any law impairing the obligation
of a contract, the Legislature further finds that it is a valid
exercise of the police powers of this state and in the interest
of the state of West Virginia and in furtherance of the welfare
of its citizens, to discourage as far as constitutionally possible
the production and marketing of oil and gas located in this
state under the type of leases or other continuing contracts
described above.

(b) In the light of the foregoing findings, the Legislature
hereby declares that it is the policy of this state, to the extent
possible, to prevent the extraction, production or marketing of
oil or gas under a lease . . . which is not inherently related to
the volume of oil or gas produced or marketed[.]

*Id.* (emphasis added).

The flat-rate statute manifests the Legislature's recognition that evolving

technology and changing market conditions had, at least by 1982, fundamentally altered

the underlying assumptions historically governing the contractual relationship between

the owners of oil and gas in place and the business interests engaged in extracting and

transporting those minerals for profit.  To advance the Legislature's stated policy of

eradicating unfair and inadequate compensation to owners of valuable oil and gas

interests, the flat-rate statute prohibits the issuance of permits for new drilling or for the

3

reworking of existing wells unless a copy of the lease or a suitable abstract thereof accompanies the permit application.  *See id.* § 22-6-8(c).  Where such lease or abstract discloses an underlying flat-rate compensation agreement, the statute dictates that the drilling permit likewise be withheld.  *See id.* § 22-6-8(d).  A permit may only be issued in such an instance if the applicant files

> an affidavit which certifies that the affiant is authorized by the owner of the working interest in the well to state that it shall tender to the owner of the oil or gas in place *not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest at the wellhead* for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place[.]

*Id.* § 22-6-8(e) (emphasis added).

On December 7, 2012, the plaintiffs filed a complaint in the Circuit Court of Doddridge County against EQT and the related entities, which, on January 10, 2013, the defendants removed to the United States District Court for the Northern District of West Virginia.  The operative Amended Complaint, filed in the district court on May 9, 2014, alleges that the defendants "have and continue to take deductions, reduce plaintiffs' royalty payments, overcharge plaintiffs for the deductions that they do charge plaintiffs, and otherwise reduce plaintiffs' royalty on volume and/or price and/or by taking unauthorized deductions."  The defendants employ several means to reduce the royalties paid, according to the plaintiffs, but primarily "by establishing various subsidiaries for the purpose of selling its gas and charging off to lessors the expenses which the law of

4

West Virginia does not allow unless the lease specifically provides for the same and then only when the amounts deducted are reasonable and actually incurred."  The plaintiffs contend in their Amended Complaint that "Defendants had an affirmative duty to pay to plaintiffs the true and correct royalty due them," imposed, *inter alia*, "either by virtue of the lease agreement, by virtue of W. Va. Code § 22-6-8, and/or by virtue of the contractual duty of good faith and fair dealing in all contracts[.]"

The plaintiffs asserted claims for breach of contract, for breach of fiduciary duty, and for fraud, seeking compensatory and punitive damages.  By its dismissal order of March 17, 2015, and summary judgment order entered January 22, 2016, following the conduct of discovery, the district court:  (1) awarded judgment in full to the related entities, concluding that none of them were signatories to the lease and could not otherwise be held derivatively liable; and (2) granted judgment to EQT on all of the plaintiffs' claims except for that alleging breach of contract.  With respect to the contract claim, the district court indicated its intention to certify to this Court certain questions of law relevant to its resolution.  After soliciting written submissions from the parties as to how such questions should be formulated, the district court entered the subject order of certification on February 10, 2016, which was received in this Court on February 16, 2016.  By Order entered April 6, 2016, we docketed for oral argument the following two certified questions:

> 1.      Does *Tawney v. Columbia Natural Resources, L.L.C.*,
> 219 W. Va. 266, 633 S.E.2d 22 (2006), which was decided

5

after the enactment of West Virginia Code § 22-6-8, have any effect upon the Court's decision as to whether a lessee of a flat-rate lease, converted pursuant to West Virginia Code § 22-6-8, may deduct post-production expenses from his lessor's royalty, particularly with respect to the language of "1/8 at the wellhead" found in West Virginia Code § 22-6-8(e)?

2.     Does West Virginia Code § 22-6-8 prohibit flat-rate royalties only for wells drilled or reworked after the statute's enactment and modify only royalties paid on a per-well basis where permits for new wells or to modify existing wells are sought, or do the provisions of West Virginia Code § 22-6-8 abrogate flat-rate leases in their entirety?

## II.  STANDARD OF REVIEW

In accordance with the Uniform Certification of Questions of Law Act, W. Va. Code §§ 51-1A-1 to -13 (1996), as adopted in West Virginia:

The supreme court of appeals of West Virginia may answer a question of law certified to it by any court of the United States or by the highest appellate court or the intermediate appellate court of another state or of a tribe or of Canada, a Canadian province or territory, Mexico or a Mexican state, if the answer may be determinative of an issue in a pending cause in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state.

*Id.* § 51-1A-3.  "A de novo standard is applied by this court in addressing the legal issues presented by a certified question from a federal district or appellate court."  Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998); *accord* syl. pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999) ("This Court

undertakes plenary review of legal issues presented by certified question from a federal district or appellate court.").

## III.  ANALYSIS

The parties' dispute centers on the permissibility of certain gross deductions taken by EQT prior to calculating the plaintiffs' net one-eighth proportionate royalty on the wells for which permits were issued after enactment of the flat-rate statute. In accordance with its current commercial practice, EQT sells the gas emanating from the wellheads to another sister entity, EQT Energy, LLC, at a discounted price in consideration of certain "post-production" expenses.  Those so-called "post-production" expenses, which include the estimated costs of gathering and of transportation of the natural gas to the interstate pipeline, are paid to yet another sister entity, EQT Gathering, LLC.  In addition, because some of the gas is either lost or used in the compression process, EQT determines the royalty payable to the plaintiffs only on the volume of gas actually reaching market.  The plaintiffs maintain that such deductions downstream from the physical wellhead are prohibited by the statute, specifically the decree in West Virginia Code § 22-6-8(e) that lessor royalties are to be no less than one-eighth the amount allowed to the owner of the working interest "at the wellhead," a term whose meaning we had occasion to consider during the course of our *Tawney* decision.

7

In *Tawney*, we were confronted with deciding whether lease terms such as "at the wellhead," "at the well," and "net all costs beyond the wellhead," inherently expressed the parties' clear intent that the lessee deduct post-production costs from the royalties payable to lessors. We characterized those costs in a fashion reminiscent of the ones in the instant matter, *i.e.*, "delivery of gas from the well to the [transmission company's] point of delivery, . . . processing of the gas to make it satisfactory for delivery into [the] transportation line, and losses of volume of gas due to leaks in the gathering system or other volume loss from the well to the . . . line." *Tawney*, 219 W. Va. at 269, 633 S.E.2d at 25. We acknowledged a split of authority concerning the clarity required in gas leases, and we detailed the analysis adopted by the Colorado courts that, absent specific language targeting the allocation of post-production costs, the lessee's implied covenant to market the gas precluded it from recovering any portion of those costs from the lessor. *See id.* at 270–71, 633 S.E.2d at 26–27 (citing *Rogers v. Westerman Farm Co.*, 29 P.3d 887 (Colo. 2001)).

Colorado's recognition of the lessor's implied covenant to market oil and gas comported with our own interpretation of the law, expressed in *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001).

> The rationale for holding that a lessee may not charge a lessor for "post-production" expenses appears to be most often predicated on the idea that the lessee not only has a right under an oil and gas lease to produce oil or gas, but he also

8

> had a duty, either express, or under an implied covenant, to
> market the oil or gas produced.  The rationale proceeds to
> hold the duty to market embraces the responsibility to get the
> oil or gas in marketable condition and actually transport it to
> market.

*Id.* at 210, 557 S.E.2d at 264.  In deference to the implied covenant, "the lessee must bear

all costs incurred in exploring for, producing, marketing, and transporting the product to

the point of sale," that is, "unless the lease provides otherwise."  Syl. pt. 4, *id.*  Thus, our

ultimate holding in *Tawney* that ambiguous lease language such as "at the wellhead" was

ineffective to permit the lessee to deduct post-production costs from the lessor's royalty

payments left us to fall back on "our generally recognized rule" in *Wellman* that the

implied covenant to market thrust those costs wholly upon the lessee.  *Tawney*, 219 W.

Va. at 272, 633 S.E.2d at 28.[2]  This approach to royalty valuation that we share with

Colorado, Oklahoma, and Kansas is variously referred to as the "marketable product

---

[2] We instructed specifically that

> language in an oil and gas lease that is intended to allocate
> between the lessor and lessee the costs of marketing the
> product and transporting it to the point of sale must expressly
> provide that the lessor shall bear some part of the costs
> incurred between the wellhead and the point of sale, identify
> with particularity the specific deductions the lessee intends to
> take from the lessor's royalty . . . and indicate the method of
> calculating the amount to be deducted from the royalty for
> such post-production costs.

*Tawney*, 219 W. Va. at 274, 633 S.E.2d at 30.  A lease providing that the lessor's royalty
is to be determined "at the well" or "at the wellhead" is ambiguous and, construed against
the lessee drafter, cannot overcome the effective presumption that the implied covenant
to market controls.  *See id.*

rule" or the "first marketable product rule."  *See Appalachian Land Co. v. EQT Prod. Co.*, 468 S.W.3d 841, 850 (Ky. 2015) (Abramson, J., dissenting).  In counterpoint, a majority of eleven jurisdictions adhere to the "at the well" rule, whereby post-production costs "incurred after the gas is severed and reaches the wellhead" are deducted from the eventual sale price before the lessor's royalty is calculated.  *See Appalachian Land Co.*, 468 S.W.3d at 843.[3]

Here, as EQT hastens to point out, our task of analysis pertains not to a lease, but to a statute.  Whereas we may construe any ambiguity in an oil and gas lease against its drafter (typically the lessee), no such canon of construction governs our understanding of traditional notions of statutory interpretation.  There are other ways to discern the intent of the Legislature with respect to an ambiguous enactment, however, and there is no doubt that our holdings in *Wellman* and *Tawney* compel the conclusion

---

[3] *Compare Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 230–31 (5th Cir. 1984) (applying Mississippi law); *S Bar B Ranch v. Omimex Canada, Ltd.*, 942 F. Supp. 2d 1058, 1062–63 (D. Mont. 2013); *Emery Res. Holdings, LLC v. Coastal Plains Energy, Inc.*, 915 F. Supp. 2d 1231, 1237, 1241–42 (D. Utah 2012); *Atl. Richfield Co. v. California*, 214 Cal. App. 3d 533, 541–42, (Cal. Ct. App. 1989); *Baker v. Magnum Hunter Prod., Inc.*, 473 S.W.3d 588, 591–95 (Ky. 2015); *Babin v. First Energy Corp.*, 693 So. 2d 813, 815 (La. Ct. App. 1997); *Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 894 (Mich. Ct. App. 1997); *Bice v. Petro-Hunt, L.L.C.*, 768 N.W.2d 496, 502 (N.D. 2009); *Creson v. Amoco Prod. Co.*, 10 P.3d 853, 863 (N.M. Ct. App. 2000); *Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1158 (Pa. 2010); *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 122–23 (Tex. 1996), *with Rogers v. Westerman Farm Co.*, 29 P.3d 887, 902 (Colo. 2001); syl. pt. 3, *Gilmore* v. *Superior Oil Co.*, 388 P.2d 602 (Kan. 1964); *Wood v. TXO Prod. Corp.*, 854 P.2d 880, 882–83 (Okla. 1992); syl. pt. 1, *Tawney*, 219 W. Va. 266, 633 S.E.2d 22.

that the same words—"at the wellhead"—used in the same industry context are as ambiguous in the flat-rate statute as they are in a lease. Simply put, the language

> lacks definiteness. In other words, it is imprecise. While the language arguably indicates that the royalty is to be calculated at the well or the gas is to be valued at the well, the language does not indicate *how or by what method* the royalty is to be calculated or the gas is to be valued. For example, notably absent are any specific provisions pertaining to the marketing, transportation, or processing of the gas.

*Tawney*, 219 W. Va. at 272, 633 S.E.2d at 28.

The statute provides no more detail than the *Tawney* leases as to gas valuation, royalty methodology in general, or the allocation of costs in particular. The absence of clear, unambiguous language gives rise to the uncertainty that there may be more than one way by which the holder of a working interest in an oil or gas well can comply with West Virginia Code § 22-6-8(e)'s command that the landowner's royalty be calculated "at the wellhead." It thus becomes necessary that we resort to traditional rules of statutory construction to accurately discern the intent of the Legislature. *See* syl. pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992) ("A statute that is ambiguous must be construed before it can be applied."); *State v. Gen. Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 144, 107 S.E.2d 353, 358 (1959) ("[I]n the interpretation of a statute, the legislative intention is the controlling factor; and the intention of the legislature is ascertained from the provisions of the statute by the application of sound and well established canons of construction.").

11

In that vein, we must keep in mind that the flat-rate statute was indisputably enacted to right past wrongs. *See, e.g.*, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 777, 461 S.E.2d 516, 523 (1995) ("Where an act is clearly remedial in nature, we must construe the statute liberally so as to furnish and accomplish all the purposes intended.") (citations omitted). We need not guess at the Legislature's purpose in enacting § 22-6-8, for the wrongs intended to be redressed are starkly revealed in the legislative findings and declarations indelibly engraved into the statute itself. Specifically, the sovereign is directed to do everything within its power "to prevent the extraction, production or marketing of oil or gas under a lease . . . which is not inherently related to the volume of oil or gas produced or marketed." W. Va. Code § 22-6-8(a)(4)(b). The flat-rate statute certainly accomplishes that particular aim, at least for wells permitted after its effective date, regardless of whether landowners' royalties are calculated using the "marketable product" rule or the "at the well" rule.

However, the Legislature was careful to note in addition that the exploitation of mineral resources without adequate compensation paid to landowners "is unfair, oppressive, works an unjust hardship on the owners of the oil and gas in place, and unreasonably deprives the economy of the state of West Virginia of the just benefit of the natural wealth of this state." *Id.* § 22-6-8(a)(2). It would have been perversely inconsistent with the overarching remedial intent of the flat-rate statute for a Legislature so passionately dedicated to ensuring the future flow of adequate compensation to oil and

gas landowners to have purposefully provided a mechanism of royalty valuation specifically designed to curtail that compensation.  We therefore hold that, whenever West Virginia Code § 22-6-8(e) (1994) requires the filing of an affidavit as a prerequisite to obtaining an oil or gas drilling or reworking permit, the averment in the affidavit that the landowner shall receive a royalty of not less than one-eighth of the amount realized by the holder of the working interest "at the wellhead" means that the royalty payment is not to be diluted by costs and losses incurred downstream from the wellhead before a marketable product is rendered.

EQT attempts to avoid the result mandated by § 22-6-8, contending first that the statute's enactment failed to transform the essence of the underlying agreement between the parties, which has always been manifested in a flat-rate lease.  EQT insists that the implied covenant to market does not apply to a flat-rate arrangement, because the owner is paid the same regardless of whether the gas is sold.  That argument conveniently ignores that although the terms of the lease have remained strictly effective with respect to the wells permitted prior to the enactment of the flat-rate statute, the statutory provisions set forth in § 22-6-8 unquestionably altered the basis of the parties' bargain going forward.  Logic and common sense dictate that the implied covenant to market arises in connection with the wells on the lease whereas the royalty payment to the owners, required after 1982 by the flat-rate statute, instead depends on the volume of gas produced.

13

Second, according to EQT, the statutory term "at the wellhead" is not ambiguous when considered within the historical context of the industry. When the flat-rate statute was enacted in 1982, prior to deregulation, pipeline companies purchased the gas from lessee-producers at the wellhead and then undertook the subsequent gathering and transportation expenses. The lessee paid the lessor's royalty based on the price it received from the pipeline company. Over the ensuing years, the industry practice has evolved such that the lessee has assumed the responsibility for gathering and transporting the gas to the pipeline companies, the latter acting merely as interstate carriers. The downstream price remained essentially unaffected regardless of which entity bore the expense of gathering and transportation, but when those marketability aspects were transferred to the lessees upstream, the lessees turned to the lessors (with whom they shared contractual privity) to recover a portion of the costs. In *Wellman*, we offered the following observations on that practice:

> [A] distinguishing characteristic of the landowner's royalty is that it is not chargeable with any of the costs of discovery and production . . . . In spite of this, there has been an attempt on the part of oil and gas producers in recent years to charge the landowner with a pro rata share of various expenses connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in marketable condition. To escape the rule that the lessee must pay the costs of discovery and production, these expenses have been referred to as "post-production expenses."

*Wellman*, 210 W. Va. at 209–10, 557 S.E.2d at 263–64 (alterations deleted).

14

The remedial application of the flat-rate statute together with the implied covenant to market recognized in *Wellman* and *Tawney* demand that the statutorily mandated one-eighth proportionate royalty paid to the lessor-owners of oil and gas interests, here the landowners, remain supremely constant, immune from the facile downward manipulation of such a royalty by working interest holders, here EQT, and their associates. *Accord, W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 804 (S.D. W. Va. 2014) ("The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in the open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead."). In a properly functioning royalty system, lessor-owners of oil and gas interests are accurately cast as suppliers of raw materials necessary to develop a finished product. For such raw materials, such lessor-owners are paid a one-eighth proportionate price accounted for as a cost of goods sold. Lessor-owners do not sign on to be the lessee's business partner or a participant in a joint venture with the lessee, and they should not be compelled to assume risks or expenses that would typically be associated with that sort of role.

All the preceding inevitably leads us back to the first certified question, which asks simply whether our 2006 decision in *Tawney* has "any effect" on the proper construction of the statutory term "at the wellhead," enacted in 1982 as part of West Virginia Code § 22-6-8, in connection with the minimum royalty payments due owners of

15

oil and gas in place subject to flat-rate leases. Through our discussion, we have demonstrated that *Tawney* and our earlier precedents, particularly *Wellman*, indeed inform the analysis of the issue, but the question as formulated, we believe, imprecisely addresses the particular dispute between the parties.

We therefore reformulate the question, in accordance with the discretion afforded us by West Virginia Code § 51-1A-4, as follows:

> Whenever the lessee-owner of a working interest in an oil or gas well must comply with West Virginia Code § 22-6-8(e) by tendering to the lessor-owner of the oil or gas in place a royalty not less than one-eighth of the total amount paid to or received by or allowed to the lessee, does the statute require in addition that the lessee not deduct from that amount any expenses that have been incurred in gathering, transporting, or treating the oil or gas after it has been initially extracted, any sums attributable to a loss or beneficial use of volume beyond that initially measured, or any other costs that may be characterized as post-production?

We answer that question in the affirmative.

We decline to answer the second certified question, because it is not properly before us. The Amended Complaint limits its reach to the royalty deductions taken by EQT regarding the more recently drilled lease wells that are subject to the flat-rate statute. We can discern no claim with respect to the older wells that were drilled prior to the statute's enactment and for which the plaintiffs continue to receive an annual royalty of three hundred dollars, regardless of the volume of gas produced. It is thus

16

irrelevant for the purposes of the instant litigation whether West Virginia Code § 22-6-8 abrogated flat-rate leases in their entirety.  *See* W. Va. Code § 51-1A-3 (1996) (providing that the Supreme Court of Appeals of West Virginia may answer a certified question of law "if the answer may be determinative of an issue in a pending cause in the certifying court"); *State ex rel. Advance Stores Co., Inc. v. Recht*, 230 W. Va. 464, 468–69, 740 S.E.2d 59, 63–64 (2013) ("[T]his Court will not address a certified question if it is not dispositive of a controlling issue in the case.").[4]

## IV.  CONCLUSION

Pursuant to the foregoing, we answer the first certified question, as reformulated, in the affirmative, and we decline to answer the second certified question.

First Certified Question Answered.

---

[4] We wish to acknowledge the contributions of the West Virginia Land and Mineral Owners' Association and the West Virginia Royalty Owners' Association, which jointly filed an *amicus curiae* brief in support of the plaintiffs.  We are equally appreciative of the contribution of the West Virginia Oil and Natural Gas Association, which filed an *amicus curiae* brief in support of EQT.

**FILED**
**November 17, 2016**
released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 16-0136 – *Leggett et al. v. EQT Production Co. et al.*

LOUGHRY, Justice, dissenting, joined by KETCHUM, Chief Justice:

Notice: On January 25, 2017 the Court granted a petition for rehearing in this matter.
This opinion is therefore withdrawn and no longer effective.

In deciding that this Court's decision in *Tawney*[1] controls the outcome of the instant case–one which presents a question of pure statutory interpretation rather than the lease-driven issue resolved in *Tawney*–the majority has wrongly relied on precedent that is inapposite and clearly not controlling. In its haste to fill the four square corners of *Tawney* with this arguably round case, the majority failed to recognize the distinction between how rules applicable to statutory interpretation differ significantly from those that govern contractual disputes. The majority's affirmative answer to the certified question on the issue of whether *Tawney* controls the statutory right of a lessee of a converted flat-rate lease to deduct post-production expenses from royalty payments was misguided. To conclude that the Legislature, when enacting legislation in 1982,[2] intended to convey the same meaning we implied in *Tawney* by looking to century-old oil and gas law principles is misguided. Furthermore, in failing to fully address the far-reaching effects of deregulation in the gas

---

[1]*See Estate of Tawney v. Columbia Nat. Res., L.L.C.*, 219 W.Va. 266, 633 S.E.2d 22 (2006).

[2]*See* W.Va. Code § 22-4-1 (1982), which was later recodified as W.Va. Code § 22-6-8 (1994).

1

industry in both *Tawney* and in this case, the majority has left this area of the law improvidently mired in the past.  Accordingly, I must dissent.

The issue addressed by this Court in *Tawney* was whether lease language providing for the lessor's 1/8 royalty to be calculated "at the well," "at the wellhead," or stating that the royalty is "an amount equal to 1/8 of the price, net of all costs beyond the wellhead," or "less all taxes, assessment, and adjustments" permits the lessee to deduct reasonable post-production expenses from the lessor's 1/8 royalty.  *See* 219 W.Va. at 268-69, 633 S.E.2d at 24-25.  In answering the question certified by the circuit court in *Tawney*, this Court first determined "that the 'wellhead'-type language at issue is ambiguous."  *Id.* at 272, 633 S.E.2d at 28.  Because the lessee had drafted the subject lease, this Court applied the ambiguity against it to decide that the ambiguity served to prevent the deduction of post-production expenses.  *Id.* at 273-74, 633 S.E.2d at 29-30.

In *Tawney,* this Court expressly avoided the opportunity to address the issue of whether post-production costs could properly be allocated between a lessor and a lessee. While acknowledging the split of authority on this issue, we chose not to decide the issue. *See Tawney*, 219 W.Va. at 270-71, 633 S.E.2d at 26-27.  Instead, this Court "simply look[ed] to our own settled law" and concluded in *Tawney* that the implied duty on an oil and gas lessee's part to market the subject natural resource does not permit, absent specific

2

*contractual language in a lease* providing for post-production expenses, such deductions. *Id.* at 271, 274, 633 S.E.2d at 27, 30; *see also Wellman v. Energy Resources, Inc.*, 210 W.Va. 200, 211, 557 S.E.2d 254, 265 (2001) (following decisions of Colorado, Kansas, and Oklahoma to hold that lessee impliedly covenants to market oil or gas produced which in turn requires lessee to bear post-production and transportation costs unless lease provides otherwise).

As the respondent EQT Production Company ("EQT") correctly argues, application of *Tawney* defies both logic and reason because, unlike this case, *Tawney* did not involve a flat-rate lease or the statute that governs such leases. *See* W.Va. Code § 22-6-8. In clear contrast to *Tawney*, this case should have been decided based solely on the language of the statute independent of any implied covenant that may have arisen under a lease agreement. And, under the statute, royalty payments for a converted flat rate lease are required to be determined from the total amount received by the lessee "at the wellhead." *Id.* By so designating, the Legislature was clear in specifying that such amount is calculated "at the wellhead" rather than at some downstream location or at the interstate pipeline.[3] In adopting the position of the landowners/petitioners in this case, the majority has wholly

---

[3]In drafting the legislation through which the statutory section at act was enacted, the Legislature considered and rejected earlier versions of the statute that would have omitted "at the wellhead" and instead required payments based merely on "gross proceeds" or the "total amount" received.

ignored the fact that the phrase selected by the Legislature in 1982–"at the wellhead"–had a well-established meaning within the industry when it was designated as the valuation point for royalty payments.  *See* W.Va. Code § 22-4-1 (1982); *Kilmer v. Elexco Land Services, Inc.,* 990 A.2d 1147, 1155 (Pa. 2010) (discussing fact that in 1979,  pre-deregulation "the wellhead was the point of royalty measurement" and further explaining that gas was less valuable at this stage of valuation than after its alteration from raw to "sweet" gas as result of removing extraneous substances).[4]


       Seeking quite literally to profit from the ambiguity analysis relied upon in *Tawney*,[5] the petitioners duped the majority into believing that the statutory use of the phrase "at the wellhead" is ambiguous.  Asserting a reed thin theory, the petitioners persuaded the majority that the finding by this Court in *Tawney* that such phrase was ambiguous–in a lease that required the lessee to pay royalties based on a percentage of proceeds and imposed an

---

[4]At least one recognized oil and gas treatise has expressed such puzzlement at this Court's finding of ambiguity in *Tawney* that it questioned "whether the court was really looking at a bargain struck between the parties or just imposing what it perceived to be a 'fair' and/or 'equitable' result."  Williams & Meyers, *Oil and Gas Law*, § 645.2 at p. 614.12(14) (2016).

[5]By seeking to get the gas valued downstream as opposed to "at the wellhead," the petitioners are trying to enhance their royalty payments.  *See generally Appalachian Land Co. v. EQT Production Co.*, 468 S.W.3d 841, 854 (Ky. 2015) (stating that "unprocessed natural gas at the well-head is much less valuable" compared to "processed, enhanced product delivered to the point of sale downstream"); *Kilmer,* 990 A.2d at 1155 (explaining that transformation of raw (sour) gas into marketable natural gas (sweet gas) increases price/value of gas).

implied duty to market–compels the conclusion in this case that the statutory use of that phrase must necessarily also be ambiguous.  Overlooked by the majority is the fact that the ambiguity identified in *Tawney* was in reference to whether post-production expenses could be deducted when calculating the royalty paid to the lessors.  Upon analysis, it was not the phrase itself in terms of what "at the wellhead" signifies that presented ambiguity but whether any deductions could be taken from the "at the wellhead" extraction value.  *See Rogers v. Westerman Farm Co.*, 29 P.3d 887, 897 (Col. 2001) (acknowledging argument "that 'at the well' language is silent with respect to allocation of costs"); Williams & Meyers, *Oil and Gas Law*, § 645.2 at p. 614.12(14) (addressing the "head scratching" finding of ambiguity in *Tawney* and stating: "If anything, the term 'wellhead' is very precise and definite because it is a clearly recognizable place which even laypersons can understand.").  Significantly, the petitioners in this case persuaded the majority that "at the wellhead" no longer means what it says:  instead it refers to the point at which the gas is delivered downstream where it has been transformed from raw, impure gas into "sweet" and inherently more valuable gas.[6]

The petitioners propounded at length concerning how the deregulation of the gas industry in the mid-1980s and early 1990s altered the point at which gas is sold.  *See Clough v. Williams Prod. RMT Co.*, 179 P.3d 32, 35-36 (Col. Ct. App. 2007) (detailing

---

[6]*See supra* note 5.

natural gas deregulation history and commenting that "before deregulation, buyers purchased

gas at or near the wellhead, thereby absorbing most post-wellhead costs" but "[n]ow most

gas is purchased away from the wellhead").  Implying that this Court's decision in *Tawney*

was directly affected by the deregulation of the gas industry, the petitioners state that our

decision flowed from our recognition that gas is no longer sold at the point of the wellhead

but at a subsequent point farther down the line only after the lessee has increased its value.[7]

This suggestion is disingenuous and misleading as the deregulation of the gas industry is not

even mentioned in *Tawney,* let alone relied upon as a basis for the Court's decision.  As

discussed above, what impelled this Court's decision in *Tawney* was a century-old approach

to oil and gas–the implied duty to market.  *See Tawney*, 219 W.Va. at 271, 633 S.E.2d at 27.


In designing the mechanism pursuant to which lessors would receive a 1/8

royalty when a flat rate lease was converted by means of West Virginia Code § 22-6-8, the

Legislature opted to link the royalty payment owed to the "at the wellhead" price of gas.

When this terminology was first selected in 1982, the Legislature was fully apprised as to

the meaning of that phrase.  *See also Kilmer*, 990 A.2d at 1157 (observing that when its

Guaranteed Minimum Royalty Act was enacted in 1979, Pennsylvania "legislature was not

faced with a choice of whether the [royalty] calculation should be made at the wellhead or

---

[7]Rather than citing to actual statements or findings made by this Court, the petitioners merely repeated arguments that were raised by the petitioners in *Tawney*.  *See* 219 W.Va. at 270, 633 S.E.2d at 26.

the point of sale *because they were one and the same*") (emphasis supplied); *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962) (distinguishing between wellhead or field price of gas from price received by lessee when gas is marketed). And, when the statute was recodified in 1994–after deregulation had altered the point at which gas was being sold–the Legislature nonetheless chose to retain the "at the wellhead" valuation point for purposes of applying the provisions of West Virginia Code § 22-6-8. As a result, until such time as the Legislature chooses to amend the subject statute, the phrase "at the wellhead" identifies with specificity the location for computing the price on which statutory royalty payments are to be made. *See id.*

   The principle of contract interpretation relied upon by this Court in concluding that the phrase "at the wellhead" was ambiguous in *Tawney*[8] cannot be applied to the current issue of statutory interpretation. Whereas ambiguity in a contract may be construed against the drafter of that document,[9] such an ambiguity cannot be analogously construed against the Legislature.[10] We are required to assume that the Legislature selected its terminology

---

[8]As I discussed above, it is not the phrase "at the wellhead" that this Court actually found ambiguous in *Tawney*, but whether that phrase permitted post-production expenses to be deducted from the royalty owed.

[9]*See* Syl. Pt. 1, *Martin v. Consol. Coal & Oil Corp.*, 101 W.Va. 721, 133 S.E. 626 (1926) ("The general rule as to oil and gas leases is that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee.").

[10]Citing no authority for its proposition, the petitioners fallaciously state that "the same test for ambiguity exists between contractual language and statutory language."

with a specific purpose in mind.  *See State ex rel. Barrat v. Dalby,* 236 W.Va, 316, 317, 779 S.E.2d 584, 587 (2015) (recognizing precept that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there") (internal citations omitted).  In 1982 when the subject statute was first enacted, lessors were routinely paid royalties based on a wellhead price.  Thus, "at the wellhead"–a phrase that can be stated in no clearer terms–was selected for the point of valuation because this was the location from which gas was being sold and thus, by extension, was the point at which  extracted gas was valued for royalty purposes.  *See Appalachian Power Co. v. Tax Dept.,* 195 W.Va. 573, 582, 466 S.E.2d 424, 433 (1995) ("'If the intention of the Legislature is clear, that is the end of the matter.'") (quoting *Chevron U.S.A., Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

In stark contrast to the rules used to apply oil and gas contracts, the rules that govern statutory interpretation require strict construction when the statute operates in derogation of the common law.  *See* Syl. Pt. 3, *Phillips v. Larry's Drive-in Pharmacy, Inc.*, 220 W.Va. 484, 647 S.E.2d 920 (2007).  And as we further observed in *Phillips*:

> Statutes which impose duties or burdens or establish rights or provide benefits which were not recognized by the common law have frequently been held subject to strict, or restrictive, interpretation.  When there is any doubt about their meaning or intent they are given the effect which makes the least rather than the most change in the common law.

*Id.* at 491, 647 at 927 (quoting Norman J. Singer, 3 *Sutherland Statutory Construction* § 61:1 at 217 (6th ed. 2001)).  For the petitioners to argue, and the majority to accept, that their interpretation of the statute as permitting the use of the downstream price rather than the wellhead price is in harmony with the common law is patently preposterous.  Historically, gas was sold and valued at the wellhead.  Until deregulation altered the course of business, the pipeline companies bore the costs of gathering the gas and transporting it downstream to buyers.  *Kilmer*, 990 A.2d at 1155.  The pipeline companies paid the producers a wellhead price, and the producers paid royalties on that wellhead price.  *Id.*  Once deregulation arrived, the pipeline companies became interstate carriers and not buyers and gatherers of the gas.  *Clough*, 179 P.3d at 36-36.  Only then was the concept of the netback method of royalties[11] employed as a manner of permitting the producers to deduct some or all of the additional costs of transporting the gas downstream.  As can be readily seen, the interpretation that the petitioners advanced–their statutory entitlement to a downstream valuation rather than a wellhead valuation–rather than flowing naturally from the common law, required a laborious swim upstream that is in clear contravention of legislative intent.

        The majority has been hoodwinked into believing that the remedial nature of West Virginia Code § 22-6-8 compels the result reached in this case.  With the objective of

---

        [11]Under the netback method, the additional costs of transporting the gas downstream to market are deducted to arrive at the wellhead price.

"accomplishing all the purposes intended" by the Legislature in its decision to replace flat rate royalties where possible, the majority has determined that the only way to fully serve the purposes of the Legislature is to maximize the royalties received by the lessors. *See State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W.Va. 770, 777, 461 S.E.2d 516, 523 (1995). The problem with relying on the statute's remedial purpose is that the majority has improperly broadened the reach of the statute.  The petitioners have clearly benefitted by the conversion of their flat rate leases under which they were receiving a $300 per annum payment.  In presuming that any deduction taken from the price of the gas would defeat the compensatory purposes of the statute, the majority has overstepped its jurisdiction and expanded the reach and effect of the statute. *See Henthorn v. Collins*, 146 W.Va. 108, 111, 118 S.E.2d 358, 360 (1961) ("[T]he duty to construe a remedial statute liberally can not amount to authority to a court to extend a statute to a case wholly beyond its effects."); *Wiseman v. Crislip*, 72 W.Va. 340, 348, 78 S.E. 107, 111 (1913) (recognizing that rule of remedial construction "does not authorize the court to add other supposed evils, purposes, and objects").

Simply put, there is no authority for the interpretation the majority handed the petitioners, whose clear aim is to obtain a royalty payment that is calculated on a preferential, downstream price without permitting any deductions related to transporting the gas to that location.  The statute is wholly silent on the issue of deductions.  Given the far reaching

10

alterations to the gas industry since deregulation, the Legislature needs to revisit the issue of whether the producer of gas may take any deductions from gas that is subject to royalty payments under West Virginia Code § 22-6-8. The Legislature also needs to revisit the point at which that valuation is made. If the statute is not amended to provide for a point other than the wellhead, then the Legislature needs to duly consider whether it is proper, as the majority has now set in place, for the lessors to benefit from the improved downstream cost of gas without having to contribute one penny towards either the transportation of that gas from the wellhead to the point of distribution or its improvement along the way. The landowners are clearly benefitting from the conversion statute–the question is whether they are benefitting beyond what the Legislature intended.

The petitioners seek to have their cake and eat it, too.[12] When it serves their purposes to apply age-old principles relied upon to resolve the ambiguity at the center of *Tawney,* they adhere to that approach. But when it benefits their pocketbooks to rely upon the effects of deregulation, they seize upon specific valuation concerns that arose specifically in response to deregulation. Given this Court's failure to address the effects of deregulation on the gas industry in *Tawney*,[13] it is not surprising that those issues resurfaced in this case.

---

[12]The petitioners in this case seek to gain the advantage of increased downstream gas valuation but to avoid having to bear any costs associated with the downstream travel and improvement.

[13]As one commentator has observed in its analysis of *Tawney*: "Since it was treating the language as ambiguous, the court should have admitted extrinsic evidence to explore the

11

What the majority should have recognized, however, is that the reasoning this Court applied in *Tawney* to avoid acknowledging changes to the gas industry deregulation has absolutely no bearing on the pure statutory issue presented in this case.  And, in taking the path of least resistance, the majority has merely prolonged the inevitable–squarely facing the far-reaching issues that deregulation has brought to the oil and gas industry.  By clinging to the ill-advised and arcane approach this Court employed in *Tawney*, the majority has stubbornly refused to revisit whether this state, consistent with the majority of the states in this country, should adopt the "at the well" rule, which permits the deduction of post production costs when calculating royalty payments.  *See Appalachian Land Co. v. EQT Production Co.*, 468 S.W.3d 841, 843 (Ky. 2015); *see also Pollack v. Energy Corp. of America*, 2012 WL 6929174 at *3 (W.D. Pa. 2012) (identifying *Tawney* as belonging to minority view on issue of permitting post-production deductions).

Accordingly, I dissent.

---

nature of the changing natural gas market in the United States, which might have explained why it would have been unlikely for a producer to use the netback methodology when gas sales took place at the well."  Williams & Meyers, § 645.2 at p. 614.12(14).