## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**EQT PRODUCTION COMPANY,**

        **Plaintiff,**

**v.**　　　　　　　　　　　　　　　**Civil Action No. 1:18-cv-72**
　　　　　　　　　　　　　　　　　**(Judge Keeley)**

**AUSTIN CAPERTON,**
**in his official capacity as**
**Secretary of West Virginia Department**
**of Environmental Protection,**

        **Defendant.**

## SECRETARY CAPERTON'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO DISMISS

## INTRODUCTION

Having lost the debate in the halls of the West Virginia Legislature, EQT now turns to federal court seeking damages and coercive relief against the State, challenging the constitutionality of the State's long-standing and legitimate economic regulation of the payment of royalties for oil and gas produced on flat-rate leases.

Yet this novel lawsuit must end at the beginning. A veritable mountain of Supreme Court precedent going back over a hundred years stands for the proposition that a state's exercise of its police power does not violate the Contracts Clause "simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983); *Hudson Co. v. McCarter*, 209 U.S. 349, 357 (1908) (Holmes, J.). Foreshadowing by over three decades EQT's insurmountable climb here, the leading Supreme Court cases rejecting Contracts Clause attacks on state economic legislation *themselves* involved challenges to oil and natural gas industry regulation. *See, e.g., Exxon Corp.*, 462 U.S. 176 (upholding regulation exempting royalty owners from natural gas severance tax increase and prohibiting producers from passing increase to consumers); *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983) (upholding regulation of the price of natural gas sold at the wellhead). These decisions remain undisturbed.

Let there be no question: the only way that this case can proceed—much less succeed—is if this Court adopts EQT's flawed view of the Contracts Clause, while sidestepping on-point precedent from the Supreme Court. It cannot and should not.

The motion to dismiss should be granted.

## BACKGROUND

EQT's complaint is more thoroughly understood and evaluated when viewed in the historical context of natural gas regulation in West Virginia. A fair amount of that history is recited in *McGinnis v. Cayton*, 312 S.E.2d 765 (W. Va. 1984), both in Justice Neely's opinion for the court, and in Justice Harshbarger's concurring opinion, each of which rely in substantial part on Professor (and, later, Justice) Robert T. Donley's 1951 treatise, *The Law of Coal, Oil and Gas in West Virginia and Virginia* (hereinafter DONLEY).

Lump-sum payments to lessors for natural gas production, regardless of the volume of gas produced, trace back to the nineteenth century. The *McGinnis* Court was concerned with a Ritchie County lease drafted in 1893, when "most drilling operations were primarily for oil. Gas wells were left uncontrolled to discharge into the air because profitable uses for natural gas were only then being discovered." 312 S.E.2d at 768 (citing DONLEY). Though that era's profitable uses were in large part confined to the relatively narrow realm of glassware manufacturing, "by 1930 natural gas was fully recognized as a valuable resource for residential, commercial, and industrial energy." *Id.*, 312 S.E.2d at 771 n.3 (Harshbarger, J., concurring). The economic evolution of natural gas as a worthwhile commodity certainly escaped the contemplation of the parties to the flat-rate leases negotiated decades before, however, such that it may be assumed in most cases that "both parties were operating under the assumption that the value of gas would remain *de minimis.*" *Id.*, 312 S.E.2d at 769; *see also Quintain Dev., LLC v. Columbia Nat. Res., Inc.*, 556 S.E.2d 95 (W.Va. 2001) (applying principle that contemplation of the parties controls in mineral instruments); *Cogar v. Sommerville*, 379 S.E.2d 764 (W.Va. 1989) (same).

The problem with the lease in *McGinnis* was that, although the price of gas in 1978 was much higher in constant dollars than in 1893, the $100 annual flat-rate payment to the lessor

2

*remained constant*, providing a windfall for the lessee. Worse, the *McGinnis* lease—typical of turn-of-the-century leases, like the one attached to the complaint—was subject to "a potentially perpetual renewal" on those highly unfavorable terms so long as oil or gas continued to be produced. *McGinnis*, 312 S.E.2d at 767. By contrast, in more modern leases, it was "frequently provided that gas shall be on a royalty basis, which, of course, is usually more profitable to the lessor." *Id.* at 768.

Cognizant of this history and various public interests at stake, the West Virginia Legislature in 1982 passed a bill, signed by the governor, addressing some of the persistent inequities presented by these ancient leases. The Legislature made specific findings identifying those inequities:

(a) The Legislature hereby finds and declares:

(1) That a significant portion of the oil and gas underlying this state is subject to development pursuant to leases or other continuing contractual agreements wherein the owners of such oil and gas are paid upon a royalty or rental basis known in the industry as the annual flat well royalty basis, in which the royalty is based solely on the existence of a producing well, and thus is not inherently related to the volume of the oil and gas produced or marketed;

(2) That continued exploitation of the natural resources of this state in exchange for such wholly inadequate compensation is unfair, oppressive, works an unjust hardship on the owners of the oil and gas in place, and unreasonably deprives the economy of the State of West Virginia of the just benefit of the natural wealth of this state;

(3) That a great portion, if not all, of such leases . . . have been in existence for a great many years and were entered into at a time when the techniques by which oil and gas are currently extracted, produced or marketed, were not known or contemplated by the parties, nor was it contemplated by the parties that oil and gas would be recovered or extracted or produced or marketed from the depths and horizons currently being developed by the well operators;

(4) That while being fully cognizant that the provisions of section 10, article I of the United States Constitution and of section 4, article II of the Constitution of West Virginia, proscribe the enactment of any law impairing the obligation of a contract, the Legislature further finds that it is a valid exercise of the police

3

powers of this state and in the interest of the state of West Virginia and in furtherance of the welfare of its citizens, to discourage as far as constitutionally possible the production and marketing of oil and gas located in this state under the type of leases or other continuing contracts described above.

(b) In light of the foregoing findings, the Legislature hereby declares that it is the policy of this state, to the extent possible, to prevent the extraction, production or marketing of oil or gas under a lease or leases or other continuing contract or contracts providing a flat well royalty or any similar provisions for compensation to the owner of the oil and gas in place, which is not inherently related to the volume of oil or gas produced or marketed[.]

W. Va. Code § 22-6-8 [1982] (reenacted and recodified in 1994).

The "Flat-Rate Statute," as it is sometimes referred to colloquially, manifested the Legislature's recognition that technology advances and evolving market conditions had fundamentally altered the underlying assumptions historically governing the contractual relationship between the owners of oil and gas in place and the business interests engaged in extracting and transporting those minerals for profit.

To advance the Legislature's stated policy of discouraging unfair and inadequate compensation to owners of valuable oil and gas interests, the Flat-Rate Statute prohibits the issuance of permits for new drilling or for the reworking of existing wells unless a copy of the lease or suitable abstract thereof accompanies the permit application. *See* W. Va. Code § 22-6-8(c). Where the lease or abstract discloses an underlying flat-rate compensation agreement, the statute requires that the drilling or reworking permit be withheld. *See id.* § 22-6-8(d). In such an instance, a permit may only be issued if the lessee agrees to begin paying the lessor royalties based on production volumes, evidenced by the applicant filing

an affidavit which certifies that the affiant is authorized by the owner of the working interests in the well to state that it shall tender to the owner of the oil or gas in place not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest ***at the wellhead*** for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set

4

aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well.

*Id.* § 22-6-8(e) (emphasis added).

An oil or gas "wellhead" literally is the surface structure providing the physical interface between the underground casing and tubing on the one hand, and the production equipment on the other. When the flat-rate statute was initially enacted in 1982, pipeline companies purchased the natural gas from the lessees at the wellhead, absorbing the expenses of gathering the gas from many wells and transporting it to market for retail sale. The lessee producers paid royalties to the lessor landowners based on the price the producers received from the pipeline companies. Not long thereafter, however, Congress fundamentally altered the status quo:

> In the 1980's the natural gas industry changed dramatically based on fears that the pipeline companies had monopoly power. The federal government required pipeline companies to unbundle their transportation services from their own natural gas sales efforts and, in effect, provide common-carriage services to others, including gas producers, who wished to transport natural gas. This has been referred to as the deregulation of the industry.

*Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1155 (Pa. 2010). Gas producers thus received access to the transportation network beyond the wellhead and, concomitantly, they began to bear the expenses (and reap the profits) of retail sales, though that was often accomplished by the creation of closely affiliated production, gathering, and sales companies.

West Virginia has adopted the public policy view that the landowner's royalty "is not chargeable with any of the costs of discovery or production." *Wellman v. Energy Res., Inc.*, 557 S.E.2d 254, 264 (W. Va. 2001) (citation omitted). The *Wellman* Court nonetheless observed:

> In spite of this, there has been an attempt on the part of oil and gas producers in recent years to charge the landowner with a pro rata share of various expenses connected with the operation of an oil and gas lease such as the expense of transporting oil and gas to a point of sale, and the expense of treating or altering the oil and gas so as to put it in a marketable condition. To escape the rule that the

> lessee must pay the costs of discovery and production, these expenses have been referred to as "post-production expenses."

*Id.*; *see also Kilmer*, 990 A.2d at 1149 n.2 (distinguishing between "production costs," which "refer to the expenses of getting gas to the point it exits the ground," and "post-production costs," which "refer to expenditures from when the gas exits the ground until it is sold"). Thus, although the physical wellhead referred to in Section 22-6-8(e) has remained constant since 1982, lessee-landowners began to receive smaller royalties relative to gross value *because the initial sale point had moved downstream from the wellhead*, affording the producers an excuse to "net back" the market value of the gas at the lease. *See id.* at 1149 (explaining use of "net-back method" by gas companies "to determine the value of the gas when it leaves the ground . . . at the wellhead by deducting from the sales price the costs of getting the natural gas from the wellhead to the market" (parentheses and internal quotation marks omitted)).

In late 2012, several landowners filed suit in Doddridge County against EQT, alleging that its method of calculating royalties violated the Flat-Rate Statute. The matter was removed to this federal district, which certified questions to the Supreme Court of Appeals of West Virginia. Initially, the Supreme Court decided in favor of the landowner plaintiffs. *See Leggett v. EQT Prod. Co.*, No. 16-0136, 2016 WL 6835732 (Nov. 17, 2016) (copy attached as Exhibit A) (hereinafter "*Leggett I*"), *opinion withdrawn on rehearing* (Jan. 25, 2017). Justice Benjamin authored *Leggett I* for the 3-2 majority, in which the "at the wellhead" language was deemed ambiguous, but, consistently with the remedial purposes of the Flat-Rate Statute, construed to preserve the landowners' full royalty. *See Leggett I* at 10-14. Three years previously, in a separate federal proceeding, Judge Goodwin came to the same conclusion. *See W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 804 (S.D. W. Va. 2013) ("The defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the

defendants later sell the gas in the open market at a higher price. Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead."); *see also Leggett I* at 15 ("Lessor-owners do not sign on to be the lessee's business partner or a participant in a joint venture with the lessee, and they should not be compelled to assume risks or expenses that would typically be associated with that sort of role.").

EQT petitioned for rehearing of *Leggett I*. With Justice Benjamin having been replaced on the Supreme Court effective January 1, 2017, the petition was granted and a new opinion substituted. *See Leggett v. EQT Prod. Co.*, 800 S.E.2d 850 (W. Va. 2017) (hereinafter "*Leggett II*"). On the second go-round, the new majority determined that the statutory term "at the wellhead" was not ambiguous, and that the Flat-Rate Statute permitted EQT to deduct from the landowners' royalties its downstream transportation and processing expenses. Justice Davis noted in dissent that a bill had been introduced to delete the "at the wellhead" language from Section 22-6-8(e), but that the effort had died in committee. *See Leggett II*, 800 S.E.2d at 874 (Davis, J., dissenting); *see also id.* (noting that the Legislature's decision "not to remove" the "implications from *Wellman*" and additional West Virginia precedent contrary to the majority's analysis of the Flat-Rate Statute demonstrates that "the implication was correct").

Justice Workman, though aligning with the original majority in *Leggett I*, switched sides and concurred with the rehearing majority, authoring a separate opinion in which she "urge[d] the Legislature to enact specific protections to assure fairness and reasonableness in the calculation of post-production costs." *Leggett II*, 800 S.E.2d at 869 (Workman, J., concurring).

The Legislature did just that during its next succeeding session, amending the Flat-Rate Statute to specifically abrogate the effect of *Leggett II*. The legislative amendment removed the reference to "at the wellhead," clarifying that, effective May 31, 2018, the landowner's one-

eighth royalty is to be paid on the "gross proceeds" of the sale of oil or gas "received at the first point of sale to an unaffiliated third-party purchaser in an arm's length transaction," and that the royalty shall be "free from *any* deductions for post-production expenses." W. Va. Code § 22-6-8(e) (2018). The new legislation, consistent with the views of Judge Goodwin and *Leggett I*, definitively rolled back the erosion of landowners' rights undertaken over the past thirty years or more by EQT and other gas producers, reaffirming the traditional public policy of the State as expressed in *Wellman*.

This lawsuit soon followed. EQT claims that three different provisions of state law violate the Contracts Clause. In Count I, EQT alleges that the so-called "permit-prohibition" of the Flat-Rate Statute, W. Va. Code § 22-6-8(a)(1), which has prohibited—*since its enactment 1982*—the issuance of permits for new or reworked wells subject to flat-rate leases, violates the Contracts Clause. In Count II, EQT alleges that the same section violated its Contracts Clause rights from 1982 until May 31, 2018, because it required as a condition to obtain necessary permits that lessors be paid a one-eighth royalty on the same price of natural gas "at the wellhead"—that is, at the moment it is extracted from the ground. Finally, in Count III, EQT alleges that the recent change in the Flat-Rate Statute, effective May 31, 2018, also violates the Contracts Clause because it conditions the issuance of necessary permits on EQT's agreement to provide lessors with an extraction-based royalty based on the proceeds received from the production of natural gas, at the first unaffiliated sale and without deduction of post-production expenses.

## ARGUMENT

EQT's complaint fails to state a claim upon which relief can be granted, for several reasons. *See* Fed. R. Civ. P. 12(b)(6).

*First*, EQT's Section 1983 claims fail as a matter of law. Because this suit is brought against Secretary Caperton only in his official capacity, the claims are against the State itself. This dooms both EQT's request for money damages under the Eleventh Amendment and its Section 1983 claims in their entirety under *Will v. Michigan Dep't of State Police*, 491 U.S. 58, (1989). If that were not enough, the Fourth Circuit has definitively held that a Section 1983 claim "alleging state impairment of a private contract will not lie" absent narrow exceptions not applicable here. *Crosby v. City of Gastonia*, 635 F.3d 634, 640–41 (4th Cir. 2011).

*Second,* regardless of the Section 1983 infirmities, EQT's Contracts Clause claims fail on the merits.

To begin with, the Flat-Rate Statute does not operate as a "substantial" impairment because the long history of extensive state regulation of the natural gas industry means that EQT reasonably should have anticipated future such regulation. *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983). Any impairment is also not "substantial" because the Flat-Rate Statute does not abolish EQT's right to recover and market gas; rather, it merely modifies how royalties on the leases would be paid. *City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 393 (4th Cir. 1995). Similarly, the contract provisions allegedly impaired by state law were *not* essential to EQT's contracts at the time of their execution, because the "central undertaking" of the parties was the recovery of oil—*not natural gas*. *Id*. at 393.

But even apart from the lack of a "substantial" impairment, EQT cannot overcome the significant and "legitimate public purpose" behind the State's regulation of royalty payment provisions in flat-rate leases, including "the elimination of unforeseen windfall profits," which the Supreme Court has expressly recognized as legitimate. *Energy Reserves*, 459 U.S. at 412; *see* W. Va. Code § 22-6-8(a). And because federal courts must "properly defer to legislative

judgment as to the necessity and reasonableness of a particular measure," *id*. at 412-13, this Court must decline EQT's attempt to substitute its own preferences for the State's chosen means of regulation, enacted through the democratic process.

*Finally*, the posture of this motion poses no difficulty: Contracts Clause claims are often dismissed at the Rule 12(b)(6) stage.[1]  This one is no exception.

## I.     EQT's Section 1983 claims must be dismissed.

### A.     The Eleventh Amendment bars claims against Austin Caperton in his official capacity.

The Eleventh Amendment bars suits in federal courts for money damages against an "unconsenting State." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). This immunity extends to "arm[s] of the State," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977), "including state agencies and state officers acting in their official capacity." *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996); *see Ballenger v. Owens*, 352 F.3d 842, 845 (4th Cir. 2003) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984)); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself.") (citation omitted). "The largely, if not wholly, dispositive factor in determining whether an entity is properly characterized as an arm of the state is whether the state treasury will be liable for the judgment."

---

[1]  *See, e.g., Xcaliber Int'l, Ltd. LLC v. Georgia ex rel. Carr*, 253 F. Supp. 3d 1220, 1233–39 (N.D. Ga. 2017) (Rule 12(b)(6) dismissal of Contracts Clause challenge to state regulation); *S & M Brands, Inc. v. State ex rel. Carr*, 253 F. Supp. 3d 1195, 1209–15 (N.D. Ga. 2017) (same); *TF-Harbor, LLC v. City of Rockwall, Tex.*, 18 F. Supp. 3d 810, 822-26 (N.D. Tex. 2014) (same); *Eagle SPE NV I, Inc. v. Kiley Ranch Communities*, 5 F. Supp. 3d 1238, 1258 (D. Nev. 2014) (same); *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 54 (D. Conn. 2013) (same); *Bricklayers Union Local 21 v. Edgar*, 922 F. Supp. 100, 107 (N.D. Ill. 1996) (same); *see also Cycle City, Ltd. v. Harley-Davidson Motor Co.*, 81 F. Supp. 3d 993, 1005 (D. Haw. 2014) (rejecting Contracts Clause claim on Rule 12(b)(3) motion).

*Cromer*, 88 F.3d at 1332 (quotations omitted).

The Eleventh Amendment bars EQT's claims for damages against Secretary Caperton in this case. The complaint seeks damages—including "special damages" and "pre-judgment and post-judgment interest," ECF 1, at *17—from Secretary Caperton in his "official capacity." *Id*. at *1. These claims are against the State itself because Secretary Caperton is sued in his official capacity as an official of a state agency. And if there were any doubt, any money judgment rendered against him in his official capacity would be drawn from the state treasury. *See generally* W. Va. Code § 22-1-6.[2] Given that the State's Eleventh Amendment immunity has been neither waived nor abrogated, EQT's claims for damages must be dismissed.

### B. The text of Section 1983 does not permit official capacity suits against state officials.

In addition to the Eleventh Amendment bar, EQT's Section 1983 claims must also be dismissed because the plain text of Section 1983 does not apply to state officials sued in their official capacity. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989). In *Will*, the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Id*. at 71. *See, e.g.*, *Goodmon v. Rockefeller*, 947 F.2d 1186, 1187 (4th Cir. 1991) ("Insofar as the district court's order dismisses the suits against the state of West Virginia and its officials acting in their official capacities [under Section 1983], it properly relies on *Will*.").

Here, EQT makes no allegation against Secretary Caperton in his individual capacity. Rather, all claims in the complaint (as clearly indicated by the case style) are cast against the Secretary in his official capacity *only*. ECF 1 at *1. The body of the complaint confirms EQT's

---

[2] The legislature appropriates funds from the state treasury to the Department of the Environmental Protection on an annual basis. *See* S.B. 1013 (2017 First Extraordinary Session), at *41-43, http://www.wvlegislature.gov/Bill_Text_HTML/2017_SESSIONS/1X/bills/sb1013%20enr.pd.

deliberate choice of proceeding only against the Secretary in his official capacity. *See, e.g.*, ECF 1, ¶ 20, 28. Accordingly, EQT's Section 1983 claims, including its accompanying demands for injunctive relief, special damages, pre- and post-judgment interest, and attorney's fees, must be dismissed. *See Virginia Office for Prot. & Advocacy v. Reinhard*, 405 F.3d 185, 190-91 (4th Cir. 2005) (vacating award of attorney's fees where a plaintiff was not entitled to assert a claim under Section 1983 based on *Will*); *Komlosi v. New York State Office of Mental Retardation & Developmental Disabilities*, 64 F.3d 810, 815 (2d Cir. 1995) (concluding that since the defendant was an arm of the state under *Will*, "[i]t follows that [the state agency] is entitled to summary judgment dismissing [the plaintiff's Section 1983] claim as to prospective relief and attorney fees as well as damages").

### C.    EQT's Contracts Clause claims may not be brought under Section 1983.

Independent of the Eleventh Amendment and the text of Section 1983, the Fourth Circuit has squarely held that the Contracts Clause may not be enforced under Section 1983 except under very narrow circumstances not applicable here, because the Contracts Clause "confer[s]" or "secures" individual rights "only indirectly and incidentally." *See Crosby v. City of Gastonia*, 635 F.3d 634, 640–41 (4th Cir. 2011) ("[A]n attempted § 1983 action alleging state impairment of a private contract will not lie.") (citing *Carter v. Greenhow*, 114 U.S. 317, 322 (1885) (holding that a Contracts Clause claim was not actionable through the predecessor of Section 1983); *see also Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017) ("We join the Fourth Circuit and hold that an alleged Contracts Clause violation cannot give rise to a cause of action under § 1983.").

Following the Supreme Court's holding in *Carter*, the Fourth Circuit in *Crosby* held that a Contracts Clause claim is actionable under the present version of Section 1983 only in the narrow circumstances where a state has denied the citizen adjudication of his Contracts Clause

claim in the courts or where it has denied adequate relief for an already established unconstitutional impairment. *See id*.

Neither exception applies here. For starters, EQT has not plausibly alleged that the State has "denied [it] the opportunity" to seek recourse through the courts "as to whether a constitutional impairment of a contract has occurred." *Id*. Neither has EQT plausibly alleged that the State somehow "foreclosed the imposition of an adequate remedy" for an established impairment. Indeed, state law does not substantially impair the contracts at issue, as is explained below. But even if it did, the State has not foreclosed the imposition of an adequate remedy for any such impairment. Accordingly, EQT's Section 1983 claims in Counts I through III must be dismissed in their entirety, leaving only EQT's declaratory claims in Counts I and III.[3]

## II.    **EQT fails to state a claim under the Contracts Clause.**

All that remains are EQT's claims for declaratory relief, but they too must fall under the weight of existing Contracts Clause precedent, which scrutinizes alleged impairments with a skeptical eye and affords significant deference to the states' legitimate economic regulations. *See Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410-419 (1983).

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." U.S. Const. art. I, § 10, cl. 1. The "Clause is not, however, the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978). Indeed, "'literalism in the construction of the contract

---

[3] Count II must be dismissed as moot. EQT is not entitled to declaratory relief (much less an injunction) concerning the constitutionality of the part of the Flat-Rate Statute challenged in Count II that is no longer effective as of May 31, 2018, due to Senate Bill 360. *See* ECF 1 ¶¶ 16-17, 39-40. Affording such relief would obviously "constitute an impermissible advisory opinion." *W. Va. Auto & Truck Dealers Ass'n v. Ford Motor Co.*, No. 1:14CV32, 2014 WL 2440406, at *8 (N.D. W. Va. May 30, 2014) (citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)); *see also Pender v. Bank of Am. Corp.*, 788 F.3d 354, 368 (4th Cir. 2015) ("If a live case or controversy ceases to exist after a suit has been filed, the case will be deemed moot and dismissed for lack of standing.").

clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection.'" *Id.* (quoting *W. B. Worthen Co. v. Thomas*, 292 U.S. 426, 433 (1934)).

Critically, the Contracts Clause "'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.'" *Allied Structural Steel*, 428 U.S. at 241 (quoting *Manigault v. Springs*, 199 U.S. 473, 480 (1905)). Put differently, "'[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject-matter.'" *Id.* (quoting *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908) (Holmes, J.)). A law therefore does not violate the Contracts Clause "simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment." *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983). "If the law were otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements." *Id.* (quotations omitted).

Rather, "[o]nly if there is a contract, which has been substantially impaired, and there is no legitimate public purpose justifying the impairment, is there a violation of the Contract Clause." *City of Charleston v. Public Serv. Comm'n*, 57 F.3d 385, 391 (4th Cir. 1995). EQT's failure to plausibly allege both a "substantial" impairment and that "no legitimate public purpose" exists to justify the impairment dooms their Contracts Clause claims.

**A.      State law does not substantially impair EQT's contracts.**

The first step in evaluating a Contracts Clause claim is to ask "whether the state law has,

in fact, operated as a *substantial* impairment of a contractual relationship." *Energy Reserves*, 459 U.S. at 411 (quotes omitted) (emphasis added).

    **1. EQT operates in an industry long-subject to heavy state regulation.** A primary consideration, which the Supreme Court found "significant" in *Energy Reserves*, is whether "the parties are operating in a heavily regulated industry." *Id*. at 413.

    In areas where there is regulation and the possibility of future regulation exists, state action affecting private contracts are unlikely to constitute a "substantial" impairment. *See id*. In other words, a history of extensive regulation in a particular industry means that the parties contracting in that industry should have reasonably anticipated future regulation. *See Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 469 (1985) ("[P]ervasiveness of . . . prior regulation . . . suggests that absent some affirmative indication to the contrary the [complaining party] had no legitimate expectation that regulation would cease . . . ."); *see also Veix v. Sixth Ward Bldg & Loan Assn.*, 310 U.S. 32, 38 (1940).

    The same is no doubt true in this case. *Energy Reserves* itself involved a Contracts Clause challenge to a Kansas regulation of natural gas industry contracts. *See Energy Reserves*, 459 U.S. at 413 ("State authority to regulate natural gas prices is well established."). Even though Kansas did not regulate natural gas prices at the time of the execution of the contracts at issue in *Energy Reserves*, it was enough that the state's "supervision of the industry was extensive and intrusive." *Id*. at 413-14. The same goes for West Virginia, which has extensively regulated the natural gas industry for over a hundred years—a conclusion that EQT can hardly dispute. *See, e.g.*, *United Fuel Gas Co. v. Pub. Serv. Comm'n*, 80 S.E. 931, 932 (W. Va. 1914) (affirming decision of state public service commission that gas company engaged in unlawful discriminatory pricing of natural gas); *Charleston Nat. Gas Co. v. Low*, 44 S.E. 410, 411 (W. Va. 1901) (surveying

statutory regulations of natural gas transportation and storage); *id*. at 413 (recognizing that legislative power includes the "ample authority to regulate" the "fixing [of] a maximum price [of gas] to the consumer"). Indeed, EQT's challenge to the Flat-Rate Statute in Count I is itself an attack on state legislation that has been on the books for nearly 40 years. Ultimately, "[i]t is in this context" that the flat-rate lease regulations impacting EQT's expectations here "are to be viewed." *Energy Reserves*, 459 U.S. at 415.

On the other hand, reading the Contracts Clause as EQT does would mean that "any regulatory limitation" bearing on how EQT is to pay lessors for the natural gas derived from property subject to flat-rate leases would be constitutionally barred. *Id*. That is assuredly not the law. *See Hudson Cty. Water*, 209 U.S. at 357 ("One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter.") (Holmes, J.); *City of El Paso v. Simmons*, 379 U.S. 497, 515 (1965) ("Laws which restrict a party to those gains reasonably to be expected from the contract are not subject to attack under the Contract Clause, notwithstanding that they technically alter an obligation of a contract."); *see also Exxon Corp.*, 463 U.S. at 190-91 (surveying cases).

**2. The Flat-Rate Statute, including its prior versions, modifies how royalties would be paid, but does not abolish EQT's right to recover and market natural gas.** The Supreme Court "has also examined how a contract has been changed, i.e., whether a covenant was abolished or 'merely modified.'" *City of Charleston*, 57 F.3d at 393 (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977)). Modifications, as opposed to an abolished covenant, counsel against a finding of a "substantial" impairment. *See id*.

The Flat-Rate Statute, including its prior versions, only modifies the amount of royalties

that EQT is obliged to pay under its flat-rate leases, including whether particular deductions can be applied, limiting EQT's ability to drill new wells on flat-rate leaseholds *only* to the extent that it pays a different amount in royalty. The law does not abolish EQT's right to produce and market gas from its flat-rate leaseholds. Thus, EQT's right is "merely modified" as it concerns *the amount to be paid* to the lessor as a royalty in exchange for the gas. *City of Charleston*, 57 F.3d at 393 (quotations omitted).

    **3.   The flat-rate royalty payment provisions were not essential to the underlying contracts at the time of their execution.** "Finally, in determining the parties' reliance, the cases have focused on the character of the abridged right-whether it was by its nature 'the central undertaking' or 'primary consideration' of the parties." *City of Charleston*, 57 F.3d at 393 (surveying Supreme Court cases).

    Although the flat-rate royalty payment provisions on their face may be boon to EQT today, when the leases were executed, the production of natural gas was considered an afterthought—essentially a waste product. *See McGinnis v. Cayton*, 312 S.E.2d 765, 771-72 (W. Va. 1984) (Harshbarger, J., concurring) ("Oil and gas leases in the second half of the nineteenth century in West Virginia primarily promoted oil production. Gas was secondary and mostly an adjunct or a by-product.").

    At the time flat-rate leases were drafted and executed, "most drilling operations were primarily for oil. Gas wells were left uncontrolled to discharge into the air because profitable uses for natural gas were only then being discovered. It is therefore not surprising that the standard legal form for a mineral lease at that time provided for a small lump-sum payment when natural gas was extracted." *Id.*, 312 S.E.2d at 768 (citing DONLEY, *supra* at 219). Only "after natural gas began to become a valuable resource, [were] royalty provisions were altered" in

modern leases. *McGinnis*, 312 S.E.2d at 771-72 (Harshbarger, J., concurring) (citing DONLEY, *supra* at 219). Accordingly, history shows that the provisions for lump sum payment on a per-well or per-acre basis was plainly not the "primary consideration" or "the central undertaking" of the parties to such leases, which were principally *oil leases*.

In view of this, the "rights abridged"—here, the provisions calling for a periodic payment of a flat-rate or lump-sum for natural gas wells—"were not in their nature essential to the underlying contract." *City of Charleston*, 57 F.3d at 394. As the Supreme Court noted in *City of El Paso*, it cannot "'seriously be contended that the [lessees like EQT were] substantially induced to enter these contracts' on the basis of the right abridged by subsequent legislative amendment." *Id*. (quoting 379 U.S. at 514).

For each of the foregoing reasons, independently and together, EQT's contracts have not been "substantially" impaired by the Flat-Rate Statute or its former iterations under controlling Contracts Clause jurisprudence. This Court need go no further.

**B.    The State has a significant and legitimate public purpose behind its regulation of royalty payment provisions in flat-rate leases.**

Even assuming state law "substantially" impaired EQT's contracts, its claims fail for the independent reason that the State has a significant and legitimate public purpose supporting the challenged regulations. EQT's failure to plausibly allege that "*no* legitimate public purpose" underlies the contract impairment dooms their Contract Clause claims regardless of the existence of a "substantial" impairment. *City of Charleston*, 57 F.3d at 391 (emphasis added).

If a state law substantially impairs a contractual relationship, the State "must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." *Energy Reserves*, 459 U.S. at 411–12 (citations omitted). As the Supreme Court has explained, "[t]he requirement of a legitimate public purpose

guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id*. at 412.

1.   **The State's regulation of flat-rate royalty provisions is supported by a significant and legitimate public purpose.** The Supreme Court has conclusively recognized in the context of the Contracts Clause that "[o]ne legitimate state interest is the elimination of unforeseen windfall profits." *Energy Reserves*, 459 U.S. at 412 (citing *U.S. Trust Co.*, 431 U.S., at 31, n.30). Here, the State has at a minimum exercised its police power to protect oil and gas owners or lessors from the "unforeseen windfall profits" that arose from the application of ancient flat-rate leases to the modern natural gas marketplace. *See id*. Since 1982, the State's legislative findings made this been clear on the face of the statute. *See* W. Va. Code § 22-6-8(a). Based on these findings, the Legislature in subsection (b) of the statute declares the public policy supporting the Flat-Rate Statute. *See id*. § 22-6-8(b). At a minimum, the Supreme Court's holding that "the elimination of unforeseen windfall profits" is a "legitimate state interest" confirms that the Legislature's findings and purposes here are unquestionably legitimate for purposes of the Contracts Clause analysis. *Energy Reserves*, 459 U.S. at 412.

2.   **The State's regulation of flat-rate royalty payment provisions is reasonably appropriate to the public purpose justifying its adoption.** "Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Energy Reserves*, 459 U.S. at 412 (alterations in original; quotations omitted). "Unless the State itself is a contracting party," and it is not here, "[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id*.

19

at 412–13 (alteration in original).

In this case, the State's chosen means to implement its purposes are rational, "particularly in light of the deference to which the [West Virginia] Legislature's judgment is entitled." *Id*. at 418. The Legislature has determined that permits for new oil and gas wells subject to a lease providing for flat-rate or lump-sum royalty provisions will not be issued *unless* the permit applicant files an affidavit certifying that it will agree to pay the lessor a one-eighth royalty instead of a flat-rate. *See* W. Va. Code § 22-6-8(d)-(e). And to ensure the appropriate calculation of such a royalty is consistent with public policy, the Legislature adopted further provisions limiting the extent to which lessees may make deductions to the amount on which the required royalty is to be paid. *See* W. Va. Code § 22-6-8(e).

Why did the Legislature enact such regulations? Among other reasons, in order to prevent lessees from continuing to capitalize on older, flat-rate leases that provided unforeseen windfall profits in the modern natural gas marketplace, facts never contemplated at the time of the execution of those instruments. *See* W. Va. Code § 22-6-8(a); *McGinnis*, 312 S.E.2d at 768; *id*. 312 S.E.2d at 770-72 (Harshbarger, J., concurring). By the Legislature's own reckoning, limiting the issuance of permits for new wells beginning in 1982 would best guarantee that exploitation of the natural resources of the State would *not* be "in exchange for such wholly inadequate compensation" and would *not* "unreasonably deprive[] the economy of the state of West Virginia of the just benefit of [its] natural wealth." W. Va. Code § 22-6-8(a)(2). EQT's conclusory allegations otherwise "offer no viable reason to discount this logical procession, particularly in light of the deference owed legislative findings. . . ." *S & M Brands, Inc. v. Georgia ex rel. Carr*, 230 F. Supp. 3d 1338, 1350–51 (N.D. Ga. 2017) (footnote omitted).

As a general matter, this sort of review for reasonableness "is not a license for courts to

judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns*, Inc., 508 U.S. 307, 313 (1993). Under this level of judicial scrutiny, laws are "accorded a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319 (1993), and courts should be "very reluctant" to "closely scrutinize legislative choices as to whether, how, and to what extent [a State's] interests should be pursued," *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 441-42 (1985).

In any event, the State need not provide any reason to justify its economic regulation under rational basis review—there need only exist a reasonably conceivable state of facts that justify a given state action. *See Beach Commc'ns*, 508 U.S. at 315. To sustain the validity of its policy, the government is not required to provide empirical evidence. *See Vance v. Bradley*, 440 U.S. 93, 110–11 (1979). "[A] legislative choice is not subject to courtroom factfinding. . . ." *Beach Commc'ns*, 508 U.S. at 315. Rather, "[t]he burden is on the one attacking the legislative arrangement to negative *every conceivable basis* which might support it." *Heller*, 509 U.S. at 320 (emphasis added).[4] EQT has fallen far short of doing so here.

At the end of the day, it is enough that the Flat-Rate Statute and its prior versions rest comfortably within the broad range of means available to the State to achieve its desired ends to regulate the particular problems posed by lump sum royalty provisions found in flat-rate leases, many of which were executed over a hundred years ago when there was no viable market for natural gas. The Legislature simply and clearly rejected EQT's preferred policy approach to the State's regulation of royalty payment provisions in flat-rate leases. This Court should do the

---

[4] For instance, this deferential review does not give federal courts the option to speculate as to whether some other scheme could have better regulated the evils in question. *Mourning v. Family Publ'n Serv., Inc.*, 411 U.S. 356, 378 (1973). Nor can federal courts strike down a law as irrational simply because the statutory scheme lacks razor-sharp precision. *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).

same. *See Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 287 (2d Cir. 2015) ("Choosing

between competing economic theories is the work of state legislatures, not of federal courts.").[5]

## CONCLUSION

For all of these reasons, the motion to dismiss should be granted.

Respectfully Submitted,

**AUSTIN CAPERTON, in his official capacity,**

By Counsel:

*/s/ Benjamin L. Bailey*
Benjamin L. Bailey (WVSB #200)
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV   25301
(304) 345-6555 – telephone
(304) 342-1110 – facsimile
bbailey@baileyglasser.com
mhissam@baileyglasser.com
zritchie@baileyglasser.com

---

[5] EQT's "unconstitutional conditions" claims under the Due Process Clause of the Fourteenth Amendment that are contained in Counts II and III "do[] not supply an alternative basis for relief." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 969 (7th Cir. 2012). "This doctrine . . . requires close attention to the potentially implicated right." *Id*. Because EQT's unconstitutional conditions claims are "entirely derivative" of its Contracts Clause claims, *id*., they too must fail.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**EQT PRODUCTION COMPANY,**

      **Plaintiff,**

**v.**                                **Civil Action No. 1:18-cv-72**
                                                  **(Judge Keeley)**

**AUSTIN CAPERTON,**
**in his official capacity as**
**Secretary of West Virginia Department**
**of Environmental Protection,**

      **Defendant.**

## <u>CERTIFICATE OF SERVICE</u>

        I, Benjamin L. Bailey do hereby certify that on May 31, 2018, I electronically filed the foregoing **"Secretary Caperton's Memorandum of Law in Support of His Motion to Dismiss"** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

| | |
|---|---|
| WILLIAMS & CONNOLLY LLP | BABST CALLAND CLEMENTS and |
| Kannon K. Shanmugam | ZOMNIR, P.C. |
| Katherine M. Turner | Timothy M. Miller (W. Va. Bar No. 2564) |
| Eden Schiffmann | Katrina N. Bowers (W. Va. Bar No. 12337) |
| Matthew J. Greer | BB&T Square |
| (admitted *pro hac vice*) | 300 Summers Street, Suite 1000 |
| 725 Twelfth Street, N.W. | Charleston, WV 25301 |
| Washington, DC 20005 | (681) 205-8888 |
| (202) 434-5000 | tmiller@babstcalland.com |
| kshanmugam@wc.com | kbowers@babstcalland.com |
| kturner@wc.com | |
| eschiffmann@wc.com | |
| mgreer@wc.com | |

                                        */s/ Benjamin L. Bailey*
                                        Benjamin L. Bailey (WVSB #200)