**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | | |
|---|---|---|
| EQT PRODUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-72 |
| | ) | Judge Irene M. Keeley |
| AUSTIN CAPERTON, in his official capacity as | ) | |
| Secretary of the West Virginia Department of | ) | |
| Environmental Protection, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**EQT PRODUCTION COMPANY'S MEMORANDUM OF LAW**
**IN OPPOSITION TO SECRETARY CAPERTON'S MOTION TO DISMISS**

## INTRODUCTION

The Contract Clause expressly limits state power:  once private parties strike a bargain, a State cannot intervene just to ensure that its preferred party achieves a more favorable outcome. West Virginia transgressed that limitation when it enacted—and again when it amended—its Flat-Rate Statute, W. Va. Code § 22-6-8.

Although the West Virginia Legislature invoked the police power when passing the Flat-Rate Statute, the purpose of the law is clear:  the State is meddling in private contracts because the Legislature prefers one party to the other.  The Flat-Rate Statute rewrites critical payment terms in freely negotiated oil and gas leases by requiring EQT to pay a royalty calculated as a percentage of the sales price of the natural gas it extracts, rather than the flat, periodic sum to which the parties agreed.  In other words, West Virginia decided that the lessors had not made lucrative enough deals and simply shifted the fruits of the bargain to them.  The Flat-Rate Statute thus falls squarely within the Contract Clause's prohibition.

Because the Flat-Rate Statute cannot withstand Contract Clause scrutiny, the Secretary tries to camouflage it in facts not before the Court and in inapplicable law.  Remarkably, the Secretary fails to cite the Complaint *at all* in his discussion of the merits.  Rather than confronting the facts as alleged, the Secretary mischaracterizes case law and historical sources to suggest erroneously that this case has already been decided.  On the law, the Secretary cites the State's police power to eliminate "windfall profits" in attempting to justify the Flat-Rate Statute, but he fails to engage with the circumscribed nature of that power, or to confront that his argument would require the Court to make factual findings in his favor.  Further, the Secretary mistakenly suggests that rational-basis scrutiny applies to this case.

The Court should not be fooled.  On the facts as alleged in the Complaint, the Flat-Rate Statute violates the Contract Clause.  Put simply, the Constitution prevents West Virginia from doing what it did here:  interfering in private contracts for the purpose of picking winners and losers.  EQT has pleaded sufficient facts to state a claim, and the motion to dismiss should therefore be denied.

## BACKGROUND

For more than a century, EQT has sought to extract natural gas from wells it operates in West Virginia under leases that pay mineral interest owners a flat, annual royalty (typically $100 to $300 per well).  Compl. (ECF No. 1) ¶¶ 2, 10.  Many of those leases are perpetual, meaning that EQT maintains the right to extract natural gas—and continues to pay the lessor—as long as wells on the land produce gas.  Ex. A to Compl. (ECF No. 1-1) (sample lease).  Lessors are also often entitled to use gas, free of charge, in the primary dwellings on the property.  Compl. ¶ 10.  Most of the leases further provide for an additional in-kind, one-eighth royalty for any oil produced from the well.  *Id.*

During the period that the leases were executed, natural-gas extraction was a burgeoning industry, and the parties necessarily understood that the technology for extracting natural gas would continue to develop and improve.  *Id.* ¶ 11.  Thus, the leases provide for the assignment of the right to extract natural gas to the lessee in exchange for payment to the lessor, indicating the parties' awareness at the time of contracting that the gas had a marketable value.  *Id.*  The leases reflect the parties' agreement that, while the royalty on oil would be volume-based, the royalty for natural gas would be set at an annual price for the life of the lease.  *Id.* ¶ 12.  Such a flat royalty apportioned risk and benefits according to each party's preferences at the time the leases were executed.  Lessors would receive a reliable payment for natural-gas production (regardless of how

2

quickly technology developed or how fruitful such development proved to be), in addition (in many cases) to the right to as much gas as they needed for their personal use (regardless of whether the well was profitable for EQT after the lessor took her share). *Id.* Further, lessors had neither the obligation nor the need to invest in research and development necessary to improve extraction and production technologies, as they would receive their payment so long as the well was producing, but regardless of the volume of its productivity. *Id.* EQT, on the other hand, bore the obligation to pay a flat amount per producing well, and was thereby incentivized to improve natural-gas extraction, production, and marketing. *Id.* That is exactly what EQT did: over the years, EQT invested millions of dollars in technology and infrastructure to grow an integrated market for natural gas. *Id.* ¶ 13. As a direct result of EQT's long-term investments—in which the lessors did not participate and for which they bore no risk—most wells now produce more natural gas than they did when the flat-rate leases were executed. *Id.*

Over time, as EQT began to collect the rewards of the risks it undertook, while the royalty payments remained the same, lessors (or, in most cases, their successors in interest) grew dissatisfied with the terms to which they were bound in contract, and they used their considerable political clout to lobby the West Virginia Legislature to modify the parties' rights under the leases. *Id.* ¶ 14. West Virginia thus enacted the Flat-Rate Statute, seeking "to prevent the extraction, production or marketing of oil or gas under a lease . . . providing a flat well royalty." W. Va. Code § 22-6-8(b). The statute prohibits the issuance of permits for new wells subject to flat-rate leases, but provides a mechanism to "avoid the permit prohibition" if lessees such as EQT agree to pay an extraction-based royalty in place of the contractually agreed flat royalty. *Id.* § 22-6-8(e).

Until recently, the Flat-Rate Statute provided for the calculation of the royalty based on the sale price of natural gas "at the wellhead." *Leggett* v. *EQT Production Co.*, 800 S.E.2d 850 (W.

Va. 2017), *cert. denied*, 138 S. Ct. 472 (2017).[1]  In 2018, however, the Legislature amended the statute, requiring EQT to pay a still higher royalty based on the "first unaffiliated sale" and forbidding EQT from deducting the post-production expenses incurred to bring the gas to that point of sale.  Compl. ¶ 17.  As a result, the current version of the statute requires the royalty to be based on a (higher) downstream price that EQT itself never received, and prohibits EQT and its affiliates from deducting any of the post-production expenses incurred to generate that price.  In essence, the current statute not only conditions the issuance of new permits required to operate wells upon EQT's agreement to pay a volume-based premium in lieu of the contracted-for flat-rate royalty, but also assigns the lessors a share of the fruits of the post-production labors of EQT and its affiliates.

This second, increased, and emboldened redistribution of contractual benefits has forced EQT to bring this suit to vindicate its contractual rights.  West Virginia has twice rewritten the unambiguous terms of EQT's contracts.  EQT now seeks a declaration from this Court that the Flat-Rate Statute violates the Contract Clause of the United States Constitution.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint need only "'state a claim to relief that is plausible on its face.'"  *Covey* v. *Assessor of Ohio County*, 777 F.3d 186, 192 (4th Cir. 2015) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  In considering a motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See id.*

---

[1] The "at the wellhead" price is the interstate pipeline index price, less the post-production expenses incurred to gather, compress, transport, and market the gas.  Compl. ¶ 16.

## ARGUMENT

The Contract Clause, U.S. Const. Art. I, § 10, cl. 1, was enacted "to encourage trade and credit by promoting confidence in the stability of contractual obligations." *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 15 (1977). During the Revolutionary era, state legislative schemes to relieve debt obligations—to "chang[e] the relative situation of debtor and creditor"—were so abundant that they imperiled commerce and threatened the very existence of credit. *Ogden* v. *Saunders*, 25 U.S. 213, 354-355 (1827). More than that, such legislative mischief disrupted the ordinary functioning of society and destroyed citizens' ability to rely on contractual promises. *Id.* Thus, at the Constitutional Convention, the Contract Clause was added to "inspire a general prudence and industry, and give a regular course to the business of society." The Federalist No. 44 (James Madison). No longer could fluctuating state policy upend orderly commercial intercourse built upon a foundation of private promises. At its core, the Contract Clause bars a State from "adopt[ing] as its policy" the alteration of contractual obligations and from abusing its police power only to improve the situation of one contracting party relative to the other. *Home Building & Loan Ass'n* v. *Blaisdell*, 290 U.S. 398, 439 (1934). As the Founders recognized, laws with such an effect are "contrary to the first principles of the social compact, and to every principle of sound legislation." The Federalist No. 44 (James Madison).

Of course, the Contract Clause does not forbid States from enacting laws designed to remedy a broad societal problem, even if those laws incidentally affect contracts. *See Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 240-241 (1978). Requiring such a "legitimate public purpose" for laws that impair contractual obligations "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400, 412 (1983). But the Supreme Court has made clear

5

that, "if the Contract Clause means anything at all," *Allied Structural Steel*, 438 U.S. at 250-251, it must prevent States from meddling in private contracts merely to "chang[e] the relative situation of [the parties]" in a manner devoid of any broader social purpose, *Blaisdell*, 290 U.S. at 428. Even when "the public welfare is invoked as an excuse," *Allied Structural Steel*, 438 U.S. at 243 (internal quotation marks omitted), courts must examine the true purpose of the state law and determine if it is "directed merely toward a private right and not  .  .  .  [to] the public interest," *Veix* v. *Sixth Ward Building & Loan Ass'n*, 310 U.S. 32, 41 (1940).

The Flat-Rate Statute is exactly the type of law that the Contract Clause was intended to forbid.  It singles out a particular type of natural gas lease, held by a small group of lessors, and targets those preexisting leases, baldly declaring "that it is the policy of this state  .  .  .  to prevent the extraction, production or marketing of oil or gas under a [flat-rate] lease." W. Va. Code § 22-6-8(b).  West Virginia could not have more clearly "adopt[ed] as its policy  .  .  .  the destruction of contracts." *Blaisdell*, 290 U.S. at 439.  And it adopted that policy because, in the Legislature's view, flat-rate leases provide "inadequate compensation" to a small group of lessors, W. Va. Code § 22-6-8(a)(2)—thus confirming that the law is a naked attempt to "chang[e] the relative situation" of the contracting parties, *Blaisdell*, 290 U.S. at 428.

Remarkably, the Legislature signaled in the statute itself its unease regarding the constitutional validity of the statutory scheme, preemptively asserting that it enacted the statute with "full[] cognizan[ce]" of the limitations imposed by the Contract Clause.  W. Va. Code § 22-6-8(a)(4).  And though, like many clever legislatures before it, the West Virginia Legislature included a token invocation of its police power and vaguely alluded to the effects of flat-rate leases on "the economy of the State," *id.* § 22-6-8(a)(2), (4), the Legislature made no bones about what

it was doing:  rewriting private contracts to benefit a favored special-interest group.  As we will now explain, that is exactly what the Contract Clause prohibits.

## I.   THE SECRETARY IS NOT ENTITLED TO DISMISSAL OF EQT'S CONTRACT CLAUSE CLAIMS

Under the Contract Clause, the relevant inquiry is whether the State has validly exercised its police power in furtherance of a broad, societal goal or whether it has interfered with private contracts to aid a particular group.  *See United States Trust*, 431 U.S. at 21-22.  A state law violates the Contract Clause if:  (1) the law operates as a "substantial impairment" of a contractual relationship; (2) is not supported by a "significant and legitimate public purpose"; and (3) "'is [not] based upon reasonable conditions'" or is not "'of a character appropriate to the public purpose justifying the legislation's adoption.'"  *Energy Reserves Group*, 459 U.S. at 411-412 (quoting *United States Trust*, 431 U.S. at 22 (alterations omitted)).

The Complaint adequately pleads each of these elements.  First, the Flat-Rate Statute substantially impairs EQT's contractual obligation by rewriting an express payment term, and requiring EQT to pay more than it agreed to pay.  *See* Compl. ¶¶ 3-4, 14-19.  Second, West Virginia lacks any broad social justification:  the Legislature candidly admitted in the statute itself that its motivation was to correct the "unfairness" of the leases to a narrow group of preferred parties, the flat-rate lessors.  *Id.* ¶¶ 18, 20, 42, 54.  Finally, the justification that West Virginia conjures up is neither reasonable nor appropriate to its purpose:  rather than eliminating "windfall profits," the statute *creates* windfall profits in favor of lessors by providing them a far higher royalty than they bargained for, and even assigning them a share of revenues generated from the post-extraction operations of EQT and its affiliates.  Because EQT has plausibly pleaded that the Flat-Rate Statute fails on all counts, and the Secretary has failed to meet his significant burden of establishing that

the statute, as a matter of law, survives Contract Clause review, the Complaint is entitled to proceed.

**A.    EQT Has Pleaded Sufficient Facts To Demonstrate That West Virginia's Flat-Rate Statute Substantially Impairs EQT's Contractual Rights**

A state law substantially impairs contractual obligations when it "superimpose[s]  .  .  . obligations upon [a party] conspicuously beyond those that it had voluntarily agreed to undertake." *Allied Structural Steel*, 438 U.S. at 240.  A state law thus constitutes a substantial impairment where it interferes with the parties' reasonable expectations, abridges contractual rights that induced the parties to contract in the first place, or prevents a party from "safeguarding or reinstating" its rights.  *Sveen* v. *Melin*, 138 S. Ct. 1815, 1822 (2018); *see also Baltimore Teachers Union* v. *Mayor of Baltimore*, 6 F.3d 1012, 1017 (4th Cir. 1993).  The Flat-Rate Statute requires EQT to alter a specific, bargained-for payment term in EQT's leases—a term on which EQT relied for decades—by conditioning the issuance of new permits on EQT's agreement to pay more than the leases require.  Compl. ¶¶ 3-4, 14-19.  By any measure, the Flat-Rate Statute substantially impairs EQT's contractual obligations.

When it executed the leases, EQT agreed to pay a flat, periodic fee for the right to extract natural gas, regardless of the volume of gas extracted.  *Id.* ¶ 10.  The lessors agreed to accept that payment, as well as (in many cases) free natural gas to use in the primary dwellings on the property. *Id.* ¶¶ 10, 12.  The leases provide that the royalty for natural gas is set at a specific price for the life of the lease—an agreement that necessarily reflects the parties' decision that the lessors would enjoy the stability and certainty of a fixed payment while EQT would bear the benefits and risks of extracting natural gas.  *Id.*  Now that EQT is in position to reap the rewards of its bargain after decades of development and investment, West Virginia has decreed that the flat, annual payment does not "adequately" compensate the lessors who negotiated the leases.  W. Va. Code § 22-6-

8(a)(2).   West Virginia has thus effectively altered the payment term by legislative fiat, withholding necessary permits unless EQT accedes to the payment structure imposed by the State. By changing the express payment term in these private contracts, the Flat-Rate Statute substantially impairs the leases.

The Flat-Rate Statute is indistinguishable from other statutes the Supreme Court has invalidated.  For example, in *Allied Structural Steel*, the Court held that a law imposing a "pension funding charge" on certain companies and accelerating the timeline for vesting employees' benefits substantially impaired pension contracts because the law "superimpose[ed] pension obligations . . . conspicuously beyond those that [the companies] had voluntarily agreed to undertake."  438 U.S. at 239-240.  Because the law retroactively modified a "basic term of the pension contract"—the compensation that the companies had agreed to pay their employees—it worked a substantial impairment.  *Id.* at 246.

Courts across the country have followed *Allied Structural Steel*'s guidance.  In *Baltimore Teachers Union*, *supra*, the Fourth Circuit held that a law temporarily reducing public employee salaries imposed a substantial obligation on union contracts because "the right to compensation at the contractually specified level" was "central" to the agreement.  6 F.3d at 1018.  Similarly, in *Southern California Gas Co.* v. *City of Santa Ana*, 336 F.3d 885 (2003) (per curiam), the Ninth Circuit struck down an ordinance imposing charges for permits that a company was already contractually entitled to because the ordinance "indefinitely increase[d] the [company's] financial obligations beyond those specified" in the contract.  *Id.* at 892.  And in *Western National Mutual Insurance* v. *Lennes*, 46 F.3d 813 (1995), the Eighth Circuit held that a law that retroactively redistributed excess insurance premiums away from companies that were originally entitled to them constituted an "obviously substantial" impairment.  *See id.* at 819-820.

The facts pleaded in the Complaint establish that, like those laws, the Flat-Rate Statute imposes "direct, immediate and measureable" costs on an essential provision of EQT's leases: the payment term of a lease establishing royalties for natural-gas extraction. *So. Cal. Gas*, 336 F.3d at 892. The Secretary would have the Court conclude that the payment terms of the leases are somehow ancillary to the transaction. Mem. of Law in Supp. of Mot. to Dismiss ("Mem.") (ECF No. 18) at 9 (arguing that the Flat-Rate Statute "merely modifies" the payment terms of the leases). But the Secretary cannot with a straight face dispute that the compensation that EQT agreed to pay lessors in exchange for the right to extract natural gas is a "basic term of the contract." *Id.* The object of the leases is the development of natural gas and oil, and the payment terms of the leases reflect the parties' agreements regarding those rights. Because the Flat-Rate Statute imposes a different payment scheme—one "conspicuously beyond" that to which EQT agreed—it constitutes a substantial impairment.

Faced with this obvious logic, the Secretary seeks to obfuscate the relevant inquiry. First, the Secretary introduces a factual assertion, extraneous to the pleadings, that the amount EQT was willing to pay for the right to extract natural gas was not the "primary consideration" or "central undertaking" of the leases. That assertion has no basis in the record; in fact, it is contradicted by the sample lease attached to the Complaint, which shows that the flat-rate leases are short, standardized contracts, with the payment terms being one of the few terms tailored to reflect the parties' specific bargain. *See Garris* v. *Hanover Insurance*, 630 F.2d 1001, 1006 (4th Cir. 1980) (holding that a specific "bargained" over contract provision "must be accounted a critical feature of [the] total contractual relationship[]"). It is further contradicted by longstanding case law recognizing the obvious: that, in a lease providing for the extraction of oil and gas in exchange for royalties, the provision of mineral rights in exchange for royalties is a "material element to be

considered in the interpretation of the contract."  *Ohio Fuel Co.* v. *Greenleaf*, 99 S.E. 274, 278 (W. Va. 1919).  More broadly, the notion that monetary consideration is not a fundamental term of most any contract begs economic reason.  Indeed, that notion is belied by West Virginia's own action in enacting the Flat-Rate Statute:  the Legislature here deemed the payment terms of these leases to be so critical so as to require state intervention, purportedly in service of a public purpose, to shift them in favor of the lessors.

Again seeking to resist the common-sense proposition that rewriting an express payment term constitutes a substantial impairment, the Secretary and his *amici* weave a narrative of the development of the natural-gas industry.  *See* Mem. 17-18; Br. of West Virginia Land and Mineral Owners' Ass'n as *amicus curiae* (ECF No. 34) at 5-9; Br. of West Virginia Surface Owner's Rights Organization as *amicus curiae* (ECF No. 24) at 6-8.  Specifically, they contend that the original contracting parties did not consider the natural-gas royalty provisions of a lease for the "right of drilling  .  .  .  for Natural Gas," Compl., Ex. A, to be a central part of the contract.  As a preliminary matter, the Secretary's historical theorizing and factual assertions contradict the facts asserted in the Complaint.  At best, the sources the Secretary cites raise factual questions that cannot be resolved at this stage.  *See Fayetteville Investors* v. *Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991) (noting, in the context of a Rule 12(b)(6) motion, that "[t]he Fourth Circuit [has] consistently held that the district court [cannot] act upon facts alleged or proven beyond what [is] stated in a complaint" (internal quotation marks omitted)).

As the Secretary readily admits, moreover, natural gas had substantial value when the leases were executed.  *See* Mem. 2 (noting the profitable use of natural gas in glassware manufacturing).  That is reflected by the facts that EQT and the lessors assigned specific value to natural gas and that the lessors, in many cases, reserved the right to take delivery of as much natural

gas as they could use on their premises. *See* Compl., Ex. A. The leases themselves, which specifically address the parties' rights and obligations with regard to natural-gas extraction, belie the Secretary's specious claim that the payment terms were not central to the parties' agreement.

Indeed, the Secretary does not cite a single case finding no substantial impairment when a law abridges a specific, negotiated contract term. That is probably because the cases in which the courts have found no substantial impairment to exist have involved altogether different scenarios. For example, in *City of El Paso* v. *Simmons*, 379 U.S. 497 (1965), Texas sold public lands through contracts requiring modest down payments and annual interest payments. If a buyer failed to pay interest, he forfeited the land to the State but had a statutory right to redeem at any time. *See id.* at 499. Texas later enacted a five-year time limitation on the right to reinstatement. *See id.* The Supreme Court concluded that the new law did not substantially impair the contracts, on the ground that the right to reinstatement "was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking." *Id.* at 514. As the Court explained, it could not "seriously be contended that the buyer was substantially induced to enter into these contracts" by the right to reinstatement or that "he interpreted that right to be of everlasting effect." *Id.* That makes sense, because the object of those contracts was the sale of land for money, not a tangential right to reinstatement.

Similarly, in *City of Charleston* v. *Public Service Commission of West Virginia*, 57 F.3d 385 (1995), the Fourth Circuit found no substantial impairment where a law relating to bond obligations explicitly recognized that the contract terms were subject to change by state law. *See id.* at 392-393. Accordingly, the parties could not reasonably rely on the legislative *status quo* as it existed when the contracts were executed. *See id.* On the facts pleaded here, EQT contracted

for a specific payment term and relied on that payment term for decades.[2]  *See* Compl. ¶ 14.  The Flat-Rate Statute thus disrupts a central undertaking of EQT's leases and imposes a substantial impairment.

After arguing the royalty term for natural gas cannot have been critical to the contract because the value of natural gas was not yet understood, the Secretary makes a directly contradictory argument, contending that EQT should have anticipated price regulation of that commodity.  But despite the Secretary's insistence that "extensive regulation in a particular industry means that the parties contracting in that industry should have reasonably anticipated future regulation," Mem. 16, "a history of regulation is never a sufficient condition for rejecting a challenge based on the contracts clause," *Chrysler Corp.* v. *Kolosso Auto Sales, Inc.*, 148 F.3d 892, 895 (7th Cir. 1998).  While heavy regulation of an industry might reduce parties' reliance on their contractual rights, it "does not automatically foreclose the possibility of contract impairment."  *Western National*, 46 F.3d at 820.

Here, the Secretary cannot establish, much less at this preliminary stage, that West Virginia's regulatory regime gave any indication that the State would one day rewrite royalty provisions in private oil and gas leases.  In order to reduce reliance interests, a State must have regulated the "particular" contractual subject matter at issue at the time of the contract.  *See, e.g.*, *Veix*, 310 U.S. at 38; *Garris*, 630 F.2d at 1007; *Equipment Manufacturers Institute* v. *Janklow*, 300 F.3d 842, 859 (8th Cir. 2002).  Put another way, "[t]he fact that some incidents of a commercial

---

[2] *Amicus* Bounty Minerals, LLC contends that it purchased lease rights in reliance the Flat-Rate Statute's royalty provisions.  (ECF No. 32).  *Amicus* suggests that its reliance on the Flat-Rate Statute somehow makes it less of a substantial impairment of EQT's leases.  That argument merely underscores the prejudice that the Flat-Rate Statute wrought in the first place:  EQT relied on the plain terms of its leases for many decades before West Virginia upended them.  Because the State upset EQT's decades-long reliance on its negotiated lease terms, the Flat-Rate Statute is a substantial impairment.

activity are heavily regulated does not put the regulated firm on notice that an entirely different scheme of regulation will be imposed." *Chrysler*, 148 F.3d at 895.

*Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400 (1983), is not to the contrary. In that case, although Kansas did not specifically regulate intrastate natural-gas prices, *interstate* natural-gas prices had been regulated for decades. *Id.* at 414. In fact, the "very existence" of the contractual provisions at issue demonstrated that the parties contracted "against the background of regulated gas prices." *Id.* at 415. As a result, price regulation was foreseeable to the parties "as the type of law that would alter contract obligations." *Id.* at 416.

Here, by contrast, the Secretary identifies *no* history of regulating royalty payments before West Virginia enacted the Flat-Rate Statute. The mere fact that West Virginia had previously regulated "natural gas transportation and storage" and fixed a maximum price for selling natural gas to end-use consumers, Mem. 15-16, does not give the State *carte blanche* to enact any law it wants. Those peripheral regulations are inadequate to give EQT notice, before entering into the leases, that its freely negotiated contractual *royalty* terms would be disrupted. This is not to say, as the Secretary suggests, that *any* regulation affecting EQT's leases would be unconstitutional. For example, EQT is subject to safety and environmental regulations even if they have an incidental effect on its leases. Under the Secretary's interpretation of the Contract Clause, however, West Virginia could constitutionally enact any regulation—or even abolish outright EQT's contractual covenants—simply because EQT operates in a regulated industry. That ambitious position is inconsistent with decades of Contract Clause jurisprudence.

Finally, the Secretary halfheartedly urges the Court to conclude that no substantial impairment exists because the Flat-Rate Statute "does not abolish EQT's right to recover and market natural gas." Mem. 17. But the Fourth Circuit has squarely rejected that argument, stating

that "there is plainly no requirement of total repudiation." *Baltimore Teachers Union*, 6 F.3d at 1017; *see also Energy Reserves*, 459 U.S. at 411 (noting that "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment").

As the Complaint plausibly alleges, West Virginia has nullified an express payment term in private contracts. That substantial impairment of a basic contract term triggers the next step of the Contract Clause inquiry, requiring a "careful examination of the nature and purpose" of the legislation. *Allied Structural Steel*, 438 U.S. at 245. As we will now explain, the Flat-Rate Statute stumbles at that step too.

## B. The Secretary Fails To Demonstrate A Significant And Legitimate Public Purpose For Applying The Flat-Rate Statute Retroactively

Any law having the effect of substantially impairing a contract must be supported by a "significant and legitimate public purpose." *Energy Reserves*, 459 U.S. at 411. That limitation "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id.* at 412. Contrary to the Secretary's suggestion, EQT need not "negative *every conceivable basis* which might support" the Flat-Rate Statute, as it would in an equal-protection case applying rational-basis review. Mem. 22 (citing *Heller* v. *Doe*, 509 U.S. 312, 320 (1993)). The Supreme Court has explicitly declined to import Fifth Amendment principles into the Contract Clause analysis. *Pension Benefit Guaranty Corp.* v. *R.A. Gray & Co.*, 467 U.S. 717, 733 (1984). In the context of the Contract Clause, although courts "properly defer to legislative judgment as to the necessity and reasonableness of a particular measure[,]" *United States Trust Co.*, 431 U.S. at 23, no deference is due at this second step of the analysis, which considers whether a law is supported by a significant and legitimate public purpose in the first place. *See Equipment Manufacturers Institute*, 300 F.3d at 859; *United Healthcare Ins. Co.* v. *Davis*, 602 F.3d 618, 631 (5th Cir. 2010). Instead, the Secretary bears the burden of demonstrating to the Court's

independent satisfaction that a significant and legitimate public purpose underlies the Flat-Rate Statute.  *See Equipment Manufacturers Institute*, 300 F.3d at 859.  The Secretary has failed to demonstrate a legitimate public purpose here, and his motion to dismiss must therefore be denied.

The Secretary offers only one purported justification for impairing EQT's contractual obligations:  "discouraging unfair and inadequate compensation" to mineral interest holders. Mem. 4.  He and his *amici* attempt to dress up this justification as preventing "windfall profits," *see* Mem. 19, but the West Virginia Legislature gave away the game in the statute itself.  The State deemed the agreed-upon contractual payments "inadequate[,]  .  .  .  unfair, [and] oppressive." W. Va. Code § 22-6-8(a)(2).

The Secretary's weak effort to concoct this "justification" cannot support the Flat-Rate Statute's radical impairment of the payment provisions in EQT's leases.  To begin with, States may abridge contractual obligations only with a *valid* exercise of the police power.  Pure redistribution of the gains from a private contract—just because the State thinks the bargain is "unfair"—does not constitute such a valid exercise.  Beyond that, the so-called "windfall profits" justification for abrogating contract rights has been applied only in extraordinary circumstances, and even then only when supported by an otherwise significant and legitimate public purpose.  In this case, as the Complaint alleges—and as this Court must accept as true at this stage—there was no unforeseen windfall, only the foreseeable, long-term appreciation of the value of natural gas resulting from EQT's decades-long investment in technology.  Compl. ¶¶ 11-13.  West Virginia has no power to rewrite private contracts solely to benefit a small but favored special-interest group.

### 1.    *Redistributing The Benefits Of Private Bargains Does Not Constitute A Legitimate Exercise Of The Police Power*

West Virginia does not enjoy plenary police power when "[the] exercise [of that power] effects substantial modifications of private contracts."  *Allied Structural Steel*, 438 U.S. at 244. Even "a public purpose that might clearly undergird a general exercise of police power" is not exempt from Contract Clause limitations.  *Garris*, 630 F.2d at 1008; *see also United States Trust*, 431 U.S. at 21 (noting that "the existence of an important public interest is not always sufficient" to validate a substantial impairment of contract rights).  What separates a valid exercise of the police power from an invalid one is its breadth:  legislation designed to protect a "basic interest of society" may constitutionally impair contracts, but legislation "for the mere advantage of particular individuals" cannot.  *Blaisdell*, 290 U.S. at 445.  The Complaint plausibly alleges that the Flat-Rate Statute was intended specifically to advantage particular individuals who entered into a particular type of lease and who, in the State's view, are not reaping enough rewards from their contracts.  Compl. ¶ 22.  The Secretary cannot establish as a matter of law that West Virginia acted in the "broad societal interest" necessary to justify its substantial impairment of EQT's contracts. *See Allied Structural Steel*, 438 U.S. at 249.

The Secretary does not cite a single case in which a State has redistributed the benefits of a private contract solely to benefit its chosen party and survived a Contract Clause challenge.  That is probably because "economic protectionism" does not constitute a valid use of the police power when it impairs preexisting contractual obligations.  *United Healthcare*, 602 F.3d at 631.  Even lesser measures than the Flat-Rate Statute have run afoul of the Contract Clause:  merely "leveling the playing field between contracting parties," much less taking one party's gains and giving them to the other, is "expressly prohibited as a significant and legitimate public interest."  *Equipment Manufacturers Institute*, 300 F.3d at 861.

That understanding of the Contract Clause makes eminent sense. Above all, the Contract Clause is concerned with balancing the need for parties to be able to rely on binding contractual obligations with the authority of States "to safeguard the vital interests of [their] people." *Blaisdell*, 290 U.S. at 434. As such, valid exercises of the police power are those that "protect the lives, health, morals, comfort, and general welfare of the people." *Id.* at 437. Such exercises "for the promotion of the common weal" benefit the public generally, rather than narrow, special interests. *Id.*; *see also Energy Reserves*, 459 U.S. at 412 (explaining that state justifications must have a *public* purpose).

Cases upholding laws that impair contracts uniformly involve classic exercises of the police power. For example, promoting mass transportation, encouraging energy conservation, and protecting the environment are all justifications "of legitimate public concern." *United States Trust*, 431 U.S. at 28. So too are correcting imbalances between interstate and intrastate natural gas prices, *Energy Reserves*, 459 U.S. at 417; ensuring the financial integrity of a municipality, *Baltimore Teachers Union*, 6 F.3d at 1019; and protecting the public from crime, *Bannum, Inc.* v. *Town of Ashland*, 922 F.2d 197, 203 (4th Cir. 1990).

Laws that do not address "broad and general" problems, by contrast, fail to pass constitutional muster. Nullifying vesting provisions in preexisting pension contracts, for example, does not target "an important general social problem." *Allied Structural Steel*, 438 U.S. at 247. Nor does changing the circumstances under which preexisting insurance agency contracts can be terminated. *Garris*, 630 F.2d at 1009. Likewise, States cannot enact laws benefiting only a small group of in-state health insurance organizations, *Davis*, 602 F.3d at 631, or require the forfeiture of vested retirement benefits, *Mascio* v. *Public Employees Retirement System*, 160 F.3d 310, 313 (6th Cir. 1998).

The purpose of the Flat-Rate Statute is plain. West Virginia decided that the contracts were not favorable enough to a specific class of lessors, so it required EQT to pay the lessors more than the parties agreed. Although the Legislature invokes its "police power" and suggests that the law benefits the "economy of the State," those vague and unsubstantiated statements cannot justify the law—especially at this early stage, when the Court must accept EQT's factual allegations as true. And the Legislature's generic references to the State's economy are plainly pretextual. The Flat-Rate Statute does not serve any broad societal interest; it does not even purport to benefit all natural-gas lessors in the State. Instead, the beneficiaries are a narrow class of oil and gas interest holders who are the parties to the contracts. Worse, the Flat-Rate Statute disproportionately burdens EQT as the holder of the most unmodified flat-rate leases in the State. Compl. ¶ 5. There is simply "no broad public policy interest in readjusting contractual rights and obligations in pre-existing contracts." *Equipment Manufacturers Institute*, 300 F.3d at 861 n.22. That is sufficient to defeat the Secretary's proffered justification, and thus his argument for dismissal.

### 2. *EQT Pleaded Facts Establishing That It Is Not Collecting A 'Windfall'*

Even if this Court were to credit the Secretary's purported "windfall" justification, it would not save the Flat-Rate Statute. The Secretary fundamentally misunderstands what constitutes a "windfall" for Contract Clause purposes.

As an initial matter, the Secretary and *amici*'s argument that EQT is now receiving a windfall depends entirely on the unsubstantiated factual claim, which contradicts the Complaint, that the parties did not foresee the eventual value of natural gas. But as the Complaint explains, the parties "necessarily understood that the technology [in this emergent industry] would continue to develop and improve." Compl. ¶ 11. That understanding informed the parties' agreement to apportion the benefits as they did: lessors opted for a reliable payment and no risk, and EQT chose to pay a royalty no matter how much gas it extracted in exchange for realizing any upside of its

19

technological investments.  *Id.* ¶ 12.  On the facts as alleged in the Complaint, there is no "windfall"—only a contractual agreement creating an incentive for one party to develop the value of natural gas, with the possibility of reward resulting from its investment and risk.  That is exactly how the arrangement played out.  *Id.* ¶ 13.  To the extent that the Secretary's windfall argument depends on disputed facts, the Court should deny the motion to dismiss and allow the parties to proceed to discovery.[3]

Aside from any factual disputes, the Secretary is wrong on the law.  He cites *Energy Reserves*, which in turn cites *United States Trust*, for the existence of the "windfall profits" doctrine.  Mem. 19.  Neither of those cases actually applied anything like the "windfall profits" justification.  Indeed, the origins of this justification lie in Depression-era cases upholding changes to statutory deficiency judgment procedures.  *United States Trust*, 431 U.S. at 31 n.30.  The "windfall profits" justification has never been applied in a case like this one, where a State simply decided that one party was making out too well under a contract.  In fact, the "windfall profits" justification has been applied only in two narrow circumstances:  first, where a State responds to a crippling emergency, and second, where the State itself created an unexpected boon for a contracting party.  Even then, the justification has been applied only where there is an independent "significant and legitimate" public purpose undergirding the legislation.  The "windfall profits"

---

[3] In order to prevail at the motion to dismiss stage on this argument, Secretary Caperton would have to establish not only that the facts alleged in Paragraphs 11-13 of the Complaint are implausible, but that the *factual* predicate on which he relies for application of the windfall-profits justification—that the value of natural gas was neither known nor foreseeable at the time of contracting—can be resolved as a matter of law.  Secretary Caperton seems to be arguing that the purported non-foreseeability of the value of natural gas is a fact subject to judicial notice, *see* Mem. 19-20, but the opposite is true.  The West Virginia Supreme Court, for example, has recognized that natural gas was already in use in manufacturing in the 1890s, and that it is thus "plausible that the [flat-rate] lessee was aware of the burgeoning market for natural gas and struck a very advantageous bargain" and "arguable that the original lessor bore the risk of a rise in of natural gas by accepting a fixed price for the production of it on his land."  *McGinnis* v. *Cayton*, 312 S.E.2d 765, 769 & n.2 (1984).

justification has never been used simply to improve the economic position of one contracting party over the other.

Take *Blaisdell*, the Supreme Court's leading modern-era Contract Clause decision.  There, the Supreme Court upheld against a Contract Clause challenge Minnesota's mortgage moratorium law enacted in the depths of the Great Depression.  290 U.S. at 898.  As the Fourth Circuit has recognized, *Blaisdell* "turned on the specific facts of the case."  *Garris*, 630 F.2d at 1005.  When the housing market collapsed in the 1930s, creditors stood to reap massive, unforeseen gains if they were able to exercise their contractual rights to foreclose on defaulted properties.  *See Blaisdell*, 290 U.S. at 419.  That is because the Great Depression prevented debtors from redeeming their defaulted mortgages, even when the value of the property greatly exceeded the balance of their mortgage.  *See id.*  Creditors thus stood to gain a "windfall" upon foreclosure:  the value of the mortgage already collected plus the even greater value of the property itself.

Then Minnesota stepped in.  It enacted a temporary mortgage moratorium, extending the redemption period for defaulted debtors.  *See* 290 U.S. at 416.  The mortgage moratorium possessed several critical features that allowed it to pass muster under the Contract Clause.  Most importantly, Minnesota acted in response to an economic emergency.  *See id.* at 444.  But even then, the mortgage "moratorium" was just that, a *temporary* law that preserved creditors' basic contractual rights:  the creditors still held the mortgages, and the debtors were still obligated to pay the balances.  *See id.* at 447.  Finally, the law was generally applicable; it was not directed to benefit a particular class or subset of debtors.  *See id.* at 445.  In short, although the Court recognized that the law effectively prevented creditors from securing an available "windfall," it did not conclude that that effect alone was sufficient to sustain the law under the Contract Clause.  Beyond merely preventing a "windfall" to creditors, Minnesota had other, distinct public purposes

21

supporting the law:  allaying the effects of the Great Depression and ensuring the stability of the credit market.  *See id.* at 444-445.

In the other Supreme Court case applying the "windfall profits" justification, *City of El Paso* v. *Simmons*, 379 U.S. 497 (1965), the state law at issue was also supported by an independent public purpose.  In the late 1800s, as Texas was transitioning from a frontier state to a modern one, it enacted statutes to sell public lands in order to finance a public-education system.  *See id.* at 509.  The sale contracts provided for modest down payments and annual interest payments.  *See id.* at 510.  If a buyer stopped paying interest, the land was forfeited to the State, but the buyer could redeem at any time in the future.  *See id.* at 498-499.  Years after the initial sales, oil and gas deposits were discovered.  *See id.* at 511.  Speculators swooped in, taking advantage of the boundless redemption period to buy land, immediately default, and seek to redeem if they discovered oil or gas under their property (even after the land had been resold).  *See id.*  The predictable result was an "imbroglio" over land titles; in response, Texas enacted a five-year limitation on redemption.  *See id.* at 499, 513.

In upholding Texas's law, the Supreme Court noted that speculators could be restricted to "those gains reasonably to be expected from the contract."  *See City of El Paso*, 379 U.S. at 515.  Crucially, however, Texas did not seek to restrict speculators simply because it did not favor speculators.  Instead, the redemption limitation was intended to "restore confidence in the stability and integrity of land titles and to enable the State to protect and administer property in a businesslike manner."  *Id.* at 511-512.  And it was the State itself that created the situation in the first place.  *See id.* at 515 (noting that the Court would allow a State to change laws that *impose* "unforeseen advantages or burdens on a contracting party"); *see also So. Cal. Gas*, 336 F.3d at 895 (noting that, "if a *statute* causes unforeseen and unintended consequences such that private parties

would obtain windfalls they never expected, later amendment to realign a statute with the parties' expected bargain may be reasonable" (emphasis added)).  In stark contrast to West Virginia's Flat-Rate Statute, then, Texas's law was supported by public purposes other than redistributing the benefits of the contracts.

*Blaisdell* and *El Paso* thus define the scope of the "windfall profits" justification.  It applies only in narrowly delimited situations:  when a State responds to an emergency like the Great Depression or when state laws themselves created the windfall.  Even then, an independent public purpose beyond restricting a particular party's gains must be offered to support a law that impairs contractual obligations.  That requirement ensures that the State is validly exercising its police power, rather than "providing a benefit to special interests."  *Energy Reserves*, 459 U.S. at 412.

In this case, the Secretary fails to demonstrate that the Flat-Rate Statute falls in either "windfall profits" category.  The Secretary cannot seriously contend that the Flat-Rate Statute was enacted in response to a crisis on the order of the Great Depression, or to any widespread economic crisis at all.  He offers no evidence that unforeseen events frustrated the proper functioning of the leases; to the contrary, the leases succeeded in creating incentives for producers to invest in the expansion of natural-gas production.[4]  Nor does he demonstrate that the statute is supported by an independent public purpose.  *See* Part I.B.1, *supra*.  The Flat-Rate Statue, then, cannot be upheld based on a "windfall profits" justification.

Aside from lacking support in *Blaisdell* and *El Paso*, the Secretary's more expansive understanding of the "windfall profits" justification creates difficult line-drawing problems.  Is a "windfall" measured in absolute dollars or the relative economic positions of lessors and lessees?

---

[4] At a minimum, the Complaint states a claim for relief.  To the extent that this Court concludes that EQT's claims rise and fall on factual issues, it is entitled to challenge the Secretary's unsupported assertions in discovery and to develop a record regarding, among other things, the Legislature's intent in passing the Flat-Rate Statute and the foreseeability of the increased value of natural gas.

23

What does the price of natural gas have to be, exactly, to constitute a "windfall"?  And if the price of natural gas goes down, could the original contract terms be reinstated?  Understanding a "windfall" as "collecting more benefits than your contract partner," as the Secretary does, has no basis in law or logic.  Yet that is the sole justification given by the West Virginia Legislature and proffered by the Secretary in this case.

Finally on this point, even under the Secretary's definition, the Flat-Rate Statute does not eliminate "unforeseen windfall profits."  As the Complaint alleges, EQT and the lessors entered in contracts with an indefinite term, knowing full well that, as technology developed, natural gas would become more lucrative.  *See* Compl. ¶¶ 11-13.  And that is exactly what happened:  EQT invested millions of dollars in improving natural-gas extraction, storage, and transportation technology.  *See id.* ¶ 13.  By agreeing to a flat royalty, lessors explicitly agreed to allow EQT to reap the fruits of its own investment (based on risk borne only by EQT).  *See id.* ¶ 12.  Merely permitting EQT to receive the benefit it contracted to receive does not amount to a windfall profit. *See Western National*, 46 F.3d at 821.   Under any understanding of the "windfall profits" justification, therefore, that justification cannot validate the substantial burden that the Flat-Rate Statute imposes on EQT's contracts.

**C.   The Secretary Fails To Show That The Flat-Rate Statute Is A Reasonable Means Of Achieving Even West Virginia's Stated Purpose**

Even if this Court were to credit the Secretary's definition of the "windfall profits" justification, the Secretary has not met his burden to demonstrate that the Flat-Rate Statute is "reasonable" and "necessary" as a means of achieving the State's goal.

For starters, although courts "properly defer" to legislative judgments at this step of the analysis, the standard is not as deferential as rational-basis scrutiny.[5]   And because the Flat-Rate Statute benefits only a few identifiable lessors and disproportionately burdens EQT as the holder of the most unmodified flat-rate leases in West Virginia, *see* Compl. ¶ 5, it is "particularly vulnerable to the charge that it is not reasonably related to the asserted public purposes."  *Nieves* v. *Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir. 1987).  Laws with similarly narrow aims have not survived constitutional review.  *See, e.g.*, *Allied Structural Steel*, 438 U.S. at 248-249 (rejecting a pension law that had "an extremely narrow focus" because it applied to only a few employers that met specific statutory criteria); *United Healthcare*, 602 F.3d at 631 (rejecting an insurance law focused on benefiting in-state health maintenance organizations); *Mascio*, 160 F.3d at 314 n.2 (rejecting a law that targeted a small number of public employees).

Rather than eliminating "windfall profits," as the Secretary suggests, the Flat-Rate statute has the perverse effect of *creating* a windfall in favor of lessors.  For all his protestations about the necessity of restricting EQT to the gains it purportedly expected when the contracts were executed, the Secretary ignores the concomitant effects of the statute on lessors.  Rather than limiting lessors to the gains *they* expected to receive—i.e., the flat, annual payments to which they agreed—the Flat-Rate Statute bestows on lessors a more lucrative extraction-based royalty that they could not possibly have expected.  The Flat-Rate Statute thus achieves the exact opposite effect of the Secretary's asserted justification.

---

[5] The Secretary again conflates "less searching" rational-basis scrutiny with the standards imposed by the Contract Clause.  *Pension Benefit Guaranty Corp.* v. *R.A. Gray & Co.*, 467 U.S. 717, 733 (1984); *see* Mem. 21-23 (citing due-process and equal-protection cases).  The Contract Clause's stiffer restrictions on state power, however, require a correspondingly more stringent review.  At any rate, under any standard of review, the Secretary has not shown that the Flat-Rate Statute is a reasonable method of achieving the State's asserted purpose.

The "windfall profits" justification makes even less sense as support for the recent amendment to the Flat-Rate Statute.  In 2018, West Virginia doubled down on its redistribution of the benefits of flat-rate leases by mandating that the royalty be based on the "first unaffiliated sale" and prohibiting lessees such as EQT from deducting from the royalty post-production expenses incurred in gathering, compressing, transporting, and marketing the natural gas upon extraction. The Secretary tries to explain away this second rewrite of EQT's contractual payment provisions by citing the withdrawn and superseded opinion of the West Virginia Supreme Court in *Leggett*, *supra*.  *See* Mem. 6-8.

That withdrawn opinion is simply not the law.  In the operative opinion, the West Virginia Supreme Court actually held only that lessees such as EQT could deduct the post-production expenses they began to incur when the natural-gas market was deregulated in the 1970s.  *See Leggett*, 800 S.E.2d 850.  That was simply a reiteration of what the law has always been, withdrawn opinion notwithstanding.  Both before and after *Leggett*, the state of affairs was this:  if EQT paid the statutory extraction-based royalty, it could deduct post-production expenses, and the royalty was based on the first sale "at the wellhead."  But with the 2018 amendment, West Virginia chose to shift even more benefits to lessors—benefits that do not even derive from EQT's use of the leased right to extract, but instead from the post-production labors of EQT and its affiliates and the vagaries of how natural gas is brought to market.  Now, instead of sharing the post-production expenses, lessors are purportedly entitled to a royalty free of any deductions and based on a higher, "unaffiliated" sale price that EQT did not itself receive.[6]  Thus, the 2018 amendment increases the windfall already bequeathed to lessors and provides lessors a share of the revenues gained from

---

[6] In this way, the 2018 amendment disregards corporate separateness and requires a royalty based on a higher, downstream price, without regard to whether the price that EQT actually received "at the wellhead" was fair and legitimate.

the post-extraction operations of EQT and even its affiliates.  The Secretary fails to explain how any "windfall profits" justification rationally supports this additional impairment of EQT's contractual obligations.

## II.   AS THE SECRETARY ACKNOWLEDGES, HIS PROCEDURAL ARGUMENTS DO NOT WARRANT DISMISSAL

The Secretary telegraphs the weakness of his position on the merits by leading his argument with four pages of procedural posturing.  As he readily admits, however, even if all of those procedural arguments prevail, EQT's request for declaratory judgment on its Contract Clause claims remain.  Mem. 14.

The Complaint makes clear that it seeks a declaration that the Flat-Rate Statute violates the Contract Clause.  *See* Compl. at 1 ("Complaint for Declaratory Relief").  EQT intends to amend the Complaint to strike the claims for "special damages" and "pre-judgment and post-judgment interest" in the prayer for relief, Compl. 17, so the Court need not consider the Secretary's Eleventh Amendment arguments.  EQT's decision to forgo any monetary relief also defeats the Secretary's complaint that he is not a suable "person" for Section 1983 purposes under *Will* v. *Michigan Department of State Police*, 491 U.S. 58 (1989).  *See* Mem. 12.  Section 1983 suits against state officers in their official capacities are plainly allowed when the claims seek prospective relief. *Will*, 491 U.S. at 71 n.10.

In any event, the Secretary's contention that Contract Clause claims cannot ordinarily be brought under Section 1983 is wrong on the law.  *See* Mem. 12-13 (citing *Crosby* v. *City of Gastonia*, 635 F.3d 634, 641-42 (4th Cir. 2011)).  The case the Secretary cites, *Crosby*, does not help him.  In a "typical" Contract Clause case, a party who thought that his obligations were impermissibly impaired by a state statute would simply sue their counterparty or "breach" the contract and assert the Contract Clause as a defense.  *See, e.g.*, *Garris*, 630 F.2d at 1003, 1006.

But as the Fourth Circuit recognized in *Crosby*, where a State thwarts a party's attempt to vindicate its Contract Clause rights by resort to the courts, Section 1983 is a proper vehicle for the claims. *Crosby*, 635 F.3d at 642.

That is precisely what West Virginia did here.  With the Flat-Rate Statute, West Virginia introduced an intermediate step before a flat-rate lessee such as EQT can seek to vindicate its rights.  EQT cannot simply withhold the statutory royalty payments and wait to be sued by lessors. In order to operate a well under its flat-rate leases, EQT must have a permit, and the application for a permit for any new well under the leases now requires EQT to certify that it will pay the extraction-based royalty rather than the flat royalty provided for in its leases.  *See* W. Va. Code § 22-6-8(d).  Thus, EQT has no effective recourse in the courts, aside from bringing a suit against the Secretary directly.  Section 1983 is a perfectly acceptable method of so doing, although as explained above, this issue is academic in light of EQT's election not to pursue claims for damages against the Secretary and the Contract Clause's independent right of action for Declaratory Judgment Act purposes.

The Secretary is also wrong that Count II should be dismissed as moot.  The Flat-Rate Statute continues to violate the Contract Clause in two independent ways:  by requiring payment of royalties calculated as a percentage of the sales price based on the volume produced (as it has always done) and by amending the royalty calculation to base in on the "first unaffiliated sale" and eliminate deduction of post-production expenses (as the 2018 amendment does).  Both alterations of the payment terms in EQT's leases lack a "significant and legitimate" public purpose and are unreasonable.

\*      \*      \*

The Contract Clause "is not a dead letter." *Allied Structural Steel*, 438 U.S. at 241.   It remains a vital check on state power, preventing a State from arbitrarily picking winners and losers in private contracts.   On the facts as alleged in the Complaint, West Virginia's Flat-Rate Statute works a severe, permanent change to EQT's contractual relationships.   EQT has adequately pleaded the elements of a Contract Clause claim and their application to the facts at hand, and the Secretary has failed to meet his burden to demonstrate that he is entitled to dismissal.   Indeed, it is the Secretary who cannot prevail on his claims, as the Flat-Rate Statute fundamentally alters a specified, agreed-upon payment term, and it does so simply because the Legislature deemed the bargain "unfair" to a narrow class of leaseholders it preferred.   West Virginia lacked the power to enact that law, and the motion to dismiss should accordingly be denied.[7]


Respectfully submitted,


By Counsel:

---

[7] EQT believes that the Flat-Rate Statute is unconstitutional as a matter of law.  This Court has the power to convert the pending motion to a motion for summary judgment in favor of EQT if it agrees.  *See* Fed. R. Civ. P. 12(d); *Bosiger* v. *U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  In the alternative, if this Court concludes that it needs additional development of the facts and historical context of flat-rate leases and the Flat-Rate Statute, this Court should deny the motion to dismiss and permit the parties to develop the record on those issues.

OF COUNSEL:

WILLIAMS & CONNOLLY LLP

Kannon K. Shanmugam
Katherine M. Turner
Eden Schiffmann
Matthew J. Greer
*(admitted pro hac vice)*
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
kshanmugam@wc.com
kturner@wc.com
eschiffmann@wc.com
mgreer@wc.com

BABST CALLAND CLEMENTS and ZOMNIR,
P.C.

By:  */s/ Timothy M. Miller*
     Timothy M. Miller (W. Va. Bar No. 2564)
     Katrina N. Bowers (W. Va. Bar No. 12337)
BB&T Square
300 Summers Street, Suite 1000
Charleston, WV 25301
(681) 205-8888
tmiller@babstcalland.com
kbowers@babstcalland.com

*Attorneys for Plaintiff EQT Production Company*

## CERTIFICATE OF SERVICE

I, Timothy M. Miller, do hereby certify that on July 20, 2018, I electronically filed the foregoing **"EQT Production Company's Memorandum of Law in Opposition to Secretary Caperton's Motion to Dismiss"** with the Clerk of the Court using the Court's electronic filing system, which will send notification of such filing to the following CM/ECF participants:

BAILEY & GLASSER, LLP
Benjamin L. Bailey (WVSB #200)
Michael B. Hissam (WVSB #11526)
J. Zak Ritchie (WVSB #11705)
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
bbailey@baileyglasser.com
zritchie@baileyglasser.com
mhissam@baileyglasser.com

*Attorneys for Defendant Austin Caperton*

David B. McMahon
1018 Kanawha Blvd. East
1200 Blvd Tower
Charleston, WV 25301
(304) 415-5288
wvdavid@wvdavid.net

*Attorney for West Virginia Surface Owners' Rights Association*

CAREY, SCOTT, DOUGLAS & KESSLER PLLC
David R. Pogue
Michael W. Carey
901 Chase Tower
707 Virginia Street East
P.O. Box 913
Charleston, WV 25323
(304) 345-1234
drpogue@csdlawfirm.com
mwcarey@csdlawfirm.com

*Attorneys for Bounty Minerals, LLC*

PERSINGER & PERSINGER, L.C.
Howard M. Persinger, III
101 Dickenson Street
Williamson, WV 25661
(304) 235-2000
hmp3@persingerlaw.com

*Attorneys for West Virginia Land & Mineral Owners' Association, West Virginia Royalty Owners' Association, West Virginia Farm Bureau, and National Association of Royalty Owners, Appalachia*

*/s/ Timothy M. Miller*
Timothy M. Miller (WVSB #2564)

31